637 P.2d 733

**ANTWERP DIAMOND EXCHANGE OF AMERICA, INC., an Arizona corporation; and Charles E. Erickson, Appellants,**

v.

**BETTER BUSINESS BUREAU OF MARICOPA COUNTY, INC., an Arizona corporation; John Does I through X and Black and White Corporations I through X, Appellees.**

No. 15345.

Supreme Court of Arizona, In Division.

Nov. 23, 1981.

Glynn W. Gilcrease, Jr., Tempe, for appellants.

Weyl, Guyer, MacBan & Olson by Thomas G. Bakker, Phoenix, for appellees.

CAMERON, Justice.

This is an appeal from the granting of motions by the defendant, Better Business Bureau of Maricopa County, for summary judgments against the plaintiffs, Antwerp Diamond Exchange of America, Inc., and Charles E. Erickson, its president, in three counts alleging libel, violation of the Consumer and Credit Reporting Acts of the United States and the State of Arizona, 15 U.S.C. § 1681 et seq. and A.R.S. § 44–1691 et seq., and tortious interference with business relationships. We have jurisdiction pursuant to Rule 19(e), Rules of Civil Appellate Procedure, 17A A.R.S.

We must answer the following questions on appeal:

1. Were the plaintiffs Antwerp and Erickson "public figures" within the reach of the United States Constitution and *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)?

2. Did the Better Business Bureau violate its conditional privilege in making reports about the plaintiffs?

3. Did the Better Business Bureau violate the federal or state consumer or credit reporting laws, 15 U.S.C. § 1681 or A.R.S. § 44–1691, et seq.?

4. Did the defendant tortiously interfere with the plaintiffs' business relationships?

The facts necessary for a determination of these issues are as follows. Antwerp Diamond Exchange of America was an Ari-

zona corporation incorporated in July, 1976, for the primary purpose of selling diamonds and other precious stones. Sales were generated by media advertising, mailing and telephone solicitations. Charles Erickson was Antwerp's president. The Better Business Bureau is a non-profit membership corporation established and financed by businesses to encourage voluntary self-regulation. According to its policy manual, the Better Business Bureau "promotes truth in advertising and selling; maintains an impartial attitude towards firms and individuals; and is dedicated to the building and preservation of public confidence in legitimate business."

On 10 August 1976, Erickson met with the manager of the Better Business Bureau, Mr. C. Van Haaften, to discuss Antwerp's participation in the Bureau. At the meeting, Van Haaften received Erickson's employment resume and Antwerp's application for membership was encouraged. Shortly thereafter, Antwerp delivered to the Bureau copies of its sales brochure containing information about diamonds, diamond qualities and pricing, and that the expertise of the European Gemological Institute was relied upon for guaranteeing the quality of Antwerp's merchandise.

On 22 September 1976, after having had an opportunity to read Antwerp's brochure, Van Haaften wrote the first of a series of reports made between 22 September 1976 and 10 November 1977. The report stated that the claims of Antwerp that its stones were fully guaranteed and appraised by the European Gemological Institute had "not been verified." Another report contained the statement that "the Bureau has no information as to the existence or qualifications of this institute." In addition, the reports noted that Antwerp was using the names of First National Bank officials as references which the Bureau believed to be against bank rules. Affidavits submitted by the bank's representatives indicate that the names were used with the bank's permission and that information concerning Antwerp's account at the First National Bank had been authorized for public release to prospective customers.

On 11 November 1976, the Better Business Bureau published another report which repeated the statement about the "unverified" nature of Antwerp's claims. The report concluded that because the Bureau had "been advised" of the speculative nature of diamond investment, "investors are urged to exercise caution and review carefully claims of the company." Substantially similar reports were issued on six separate occasions. Throughout this time, Antwerp was vigorously objecting to the Bureau's reports and was offering to supply information as to the veracity of its claims.

In a report dated 19 August 1977, the Bureau stated that:

"According to a news article 8/16/77, Antwerp Diamond Exchange of America has been charged with fraudulently misrepresenting the investment potential and the quality of diamonds offered for sale to persons in at least 10 states. Diamonds and records have been impounded by the Phoenix Organized Crime Bureau from the company's offices and telephone boiler room."

A hearing was held on 24 August 1977, in the Superior Court of Maricopa County, to consider a motion to suppress the search warrant against the business officers of Antwerp. The Maricopa County Superior Court, after the hearing, found that there was no probable cause to believe that Antwerp had perpetrated fraud or misrepresentation in its literature or solicitations and that "all facts relied upon by this court in issuing the warrant have been sufficiently controverted." The judge further stated:

" * * * The contestant has sufficiently controverted that portion of the affidavit which indicated fraudulent investment potential."

On 29 August 1977, Antwerp's attorney, in a letter to the Better Business Bureau, objected to the word "charged" in the report. The Better Business Bureau amended the report to read "accused" rather than "charged." Antwerp also called the Better Business Bureau's attention to Judge McDonald's ruling, particularly with reference

to the ruling on the investment potential of the stones sold by Antwerp.

There is no indication that the Better Business Bureau attempted to obtain a copy of Judge McDonald's findings and order. The only comment on the judge's ruling was to report the decision and state that "[i]t is our position that Judge McDonald did not verify in the court hearing the claim with respect to the investment potential * * *."

From the granting of the motion for summary judgment, Antwerp and Erickson appeal. In considering this matter on appeal, it must be kept in mind that in a motion for summary judgment, the evidence, as well as all inferences reasonably drawn therefrom, will be viewed in the light most favorable to the parties against whom the summary judgment was rendered. *Mobile Home Estates, Inc. v. Levitt Mobile Homes Systems, Inc.*, 118 Ariz. 219, 575 P.2d 1245 (1978); *Boyle v. City of Phoenix*, 115 Ariz. 106, 563 P.2d 905 (1977). In order to grant a motion for summary judgment in this case, the trial court must have found that there were no genuine issues of material fact and that the Better Business Bureau was entitled to judgment as a matter of law. *Ferree v. City of Yuma*, 124 Ariz. 225, 603 P.2d 117 (App.1979).

## ARE PLAINTIFFS PUBLIC FIGURES?

■ The United States Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), applied the First and Fourteenth Amendments of the United States Constitution to protect publishers from the consequences of their defamatory remarks about public figures unless there is a showing of "actual malice." Actual malice is defined as a statement made with "knowledge that it was false or [a] reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, supra, 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706; *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). As long as the person being libeled is a public figure, the "actual malice" standard applies irrespective of a

publisher's characterization as "media" or "non-media." See e.g., *Davis v. Schuchat*, 510 F.2d 731 (D.C.Cir.1975); *Fox v. Kahn*, 421 Pa. 563, 221 A.2d 181, cert. denied 385 U.S. 935, 87 S.Ct. 292, 17 L.Ed.2d 215 (1966); *Jackson v. Fillibeu*, 281 A.2d 604 (Del.1971).

■ A public figure is one who: "may have attained that status by position alone * * * [or] by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy, * * * [or one who] commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967).

Or those persons who are: "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Curtis Publishing Co. v. Butts*, supra, 388 U.S. at 164, 87 S.Ct. at 1996, 18 L.Ed.2d at 1116. (Warren, C. J., concurring)

■ The Better Business Bureau contends that Antwerp and its president are public figures within the meaning of *New York Times*, supra, because of Antwerp's "wide spread and far-flung mail and solicitation campaigns." We do not agree. Even were we to hold that a person, through commercial advertising, could become a "public figure," in the instant case, the plaintiffs' mail and telephone solicitations fall short of making them "public figures" as envisioned by the United States Supreme Court. We need not apply the constitutional actual malice standard to defendant's reports. *Peagler v. Phoenix Newspapers, Inc.*, 114 Ariz. 309, 560 P.2d 1216 (1977).

## DID THE BETTER BUSINESS BUREAU VIOLATE ITS CONDITIONAL PRIVILEGE?

Antwerp and Erickson, then, are not "public figures," but "private individuals"

for the purposes of this action. As to private individuals, the United States Supreme Court has stated:

"[s]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789, 809 (1974).

In *Peagler v. Phoenix Newspapers, Inc.*, supra, this court adopted § 580B of the Restatement (Second) of Torts to define the minimum level of culpability that must be found in order to find liability under the *Gertz* mandate:

"580B. Defamation of Private Person

"One who publishes a false and defamatory communication concerning a private person, or concerning a public official or a public figure in relation to a private matter, is subject to liability, if, but only if, he

(a) knows that the statement is false and that it defames the other,

(b) acts in reckless disregard of these matters, or

(c) acts negligently in failing to ascertain them." Id. at 315, 560 P.2d at 1222.

In the instant case, we believe that there are sufficient facts alleged from which a trier of fact could find that the Better Business Bureau acted negligently in failing to ascertain and publish the true facts of the decision of the Superior Court. After publishing the newspaper article, they did not follow up with the findings of the trial court which absolved Antwerp of the prejudicial aspects of the allegations in the news article. Antwerp has stated a prima facie case of reckless disregard of the truth or negligence in failing to ascertain the truth.

▇ The Better Business Bureau, however, contends that even assuming the false and defamatory nature of the reports, it has a conditional privilege for publications and statements made in the course of supplying information to the public pursuant to its worthy consumer protection function. Reports of mercantile agencies published in good faith and upon probable cause are qualifiedly or conditionally privileged. See Annotation, Defamation-Credit Reports, 30 A.L.R.2d 776. Such conditional privilege would, in the instant case, absolve the Better Business Bureau from liability for negligently failing to ascertain the truth of the facts contained in their reports. Antwerp concedes that the Better Business Bureau has such a conditional privilege, but contends that the conditional privilege has been abused in the instant case. We agree with this and adopt the Restatement position that a conditional privilege is abused when the publisher

"(a) knows the matter to be false, or

(b) acts in reckless disregard as to its truth or falsity." § 600, Restatement (Second) of Torts.

▇ As stated above, the facts as alleged are sufficient evidence from which a trier of fact could find that there was a reckless disregard as to the truth or falsity of the statements, and that the Better Business Bureau abused its conditional privilege. We agree with Justice Spencer of the Nebraska Supreme Court:

"We recognize the need for the services of mercantile agencies, but we must not lose sight also of the need to protect an individual from the secret destruction of his good name and reputation. Users of reports of mercantile agencies usually have utmost confidence in the accuracy of such reports and act accordingly. Consequently, the privilege granted to such agencies must be a qualified one. The privilege must be predicated upon the premise that the reporting agency will exercise all reasonable care to ascertain the facts. Such reports must be compiled with regard to the effect the report will have upon the rights of the subject of the report. To be privileged, a mercantile agency's representatives must act impartially and in good faith, carefully evaluating all information before disseminating any defamatory statements to its sub-

scribers. This requires them to make a thorough and complete investigation and to fully and accurately report information only from reliable sources. An erroneous or careless report serves no purpose except to substantially damage the subject of the report, and when once the report is published, the damage has been done and very little can be done to correct it." *Bartels v. Retail Credit Co.*, 185 Neb. 304, 309, 175 N.W.2d 292, 296, 40 A.L.R.3d 1039 (1970).

We believe that when viewed in the light most favorable to Antwerp and Erickson, *Mobile Home Estates, Inc.*, supra, the evidence presents a question to the trier of fact as to whether the Better Business Bureau's actions constituted a reckless disregard of the truth as to this count and was an abuse of the Bureau's conditional privilege. The motion for summary judgment should not have been granted.

## VIOLATION OF CONSUMER AND CREDIT LAW

Antwerp contends that the Better Business Bureau violated the Consumer Reporting Agency Acts of Arizona, A.R.S. § 44–1691, et seq., and the federal "Fair Credit Reporting Act," 15 U.S.C. § 1681, et seq. The trial court disagreed and granted the Better Business Bureau's motion for summary judgment on this issue.

The two acts are similar, the federal act allowing the states to go further in regulation of credit reporting agencies than the federal statute so long as the state act is not inconsistent with the federal act. See *Credit Data of Arizona v. State of Arizona*, 602 F.2d 195 (9th Cir. 1979). Both acts define a consumer for the purposes of the act as "an individual," A.R.S. § 44–1691(1); 15 U.S.C. § 1681a(c). A "person" is defined by A.R.S. § 44–1691(6) as "an individual, partnership, corporation, association, or any other entity of whatever kind or nature." A "person" under 15 U.S.C. § 1681a(b) is "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." This

distinction between "consumer" and "person" is essential to the purpose of the act which is to cover consumer reports used mainly in determining an individual's eligibility for credit, employment or insurance.

"The Fair Credit Reporting Act was adopted 'to protect an individual from inaccurate or arbitrary information about himself in a consumer report that is being used as a "factor in determining the individual's eligibility for credit, insurance or employment. * * * ' " *Rasor v. Retail Credit Company*, 87 Wash.2d 516, 520, 554 P.2d 1041, 1045 (1976).

The purpose of the act was not meant to apply to business corporations in the obtaining of business or commercial credit. *Krumholz v. TRW, Inc.*, 142 N.J.Super. 80, 369 A.2d 413 (1976). Those in the business community usually have the means to adequately respond to false or inaccurate reports concerning their credit and business, and are not as likely to need the protection of the statute as individuals of modest means seeking credit for the purchase of goods and insurance, or in seeking employment. Antwerp, being a corporation and in the business of selling rather than purchasing, is not a consumer within the meaning of the statute and neither is Erickson, its president. Neither do we believe, as Antwerp contends, that because they are in the business of purchasing diamonds as well as selling them, they are also "consumers" as contemplated by the acts. Furthermore, there is no evidence that the Better Business Bureau has ever provided "credit information" to anyone. The Bureau denies its reports are for the purpose of evaluating credit worthiness and there is no evidence to indicate otherwise. We find no error.

## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS

Antwerp contends that the trial court erred in granting the Better Business Bureau's motion for summary judgment as to the tort of intentional interference with a business relationship.

The elements of the tort of intentional interference with a business relationship have been stated as:

"(1) The existence of valid contractual relationship or business expectancy;

(2) knowledge of the relationship or expectancy on the part of the interferor;

(3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

(4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Calbom v. Knudtzon*, 65 Wash.2d 157, 162–3, 396 P.2d 148 (1964). See also, *F.D. Hill & Co. v. Wallerich*, 67 Wash.2d 409, 407 P.2d 956 (1965); *Corinthian Corp. v. White & Bollard, Inc.*, 74 Wash.2d 50, 442 P.2d 950 (1968)." *Scymanski v. Dufault*, 80 Wash. 77, 82, 491 P.2d 1050, 1053–54 (1971).

And our Court of Appeals has stated as to intentional interference with business relationships:

"This tort is defined in Restatement of Torts, § 766 as follows: 'Except as stated in § 698 [betrothal promises], one who, without a privilege to do so, induces or otherwise purposely causes a third person not to * * * enter into or continue a business relation with another is liable to the other for the harm caused thereby." *Edwards v. Anaconda Company*, 115 Ariz. 313, 315, 565 P.2d 190, 192 (App.1977).

 In the instant case, the reports of the Better Business Bureau would certainly have the effect of dampening sales or other business transactions. Purchasers might be persuaded that a company under investigation by the Phoenix Organized Crime Bureau and operating a "boiler room" business is not one with which to do business.

The tort requires specific intent. Assuming that the statements were defamatory, whether they were intentionally so and for the purpose of interfering with the business relationships between Antwerp and the purchasers of precious stones is a fact for the finder of fact to determine. The record indicates that this fact is still open to question. It was error to grant the motion for summary judgment for intentional interference with business relationships.

Motion for summary judgment as to the violation of the consumer credit laws is affirmed. As to the other summary judgments, they are reversed and remanded for further proceedings consistent with this opinion.

HAYS and GORDON, JJ., concur.