714 P.2d 412

Catherine Sue WAGENSELLER,
Plaintiff-Appellant,

v.

**SCOTTSDALE MEMORIAL HOSPITAL;**
Donald A. Andrews and Jane Doe Andrews, his wife; Neal Brown and Jane Doe Brown, his wife; John W. Holmes and Jane Doe Holmes, his wife; and Kay Smith, a single person, Defendants-Appellees.

No. 1 CA–CIV 6215.

Court of Appeals of Arizona, Division 1, Department D.

June 21, 1984.

Hocker & Axford, P.C. by Naida B. Axford, R. Kelly Hocker, Tempe, for plaintiff-appellant.

Thomas V. Rawles, Mesa, and Fennemore, Craig, von Ammon, Udall & Powers, P.C. by John D. Everroad, R.C. Mitten, Phoenix, for defendants-appellees.

## OPINION

KLEINSCHMIDT, Judge.

This case arises out of the discharge of a registered nurse, Catherine Sue Wagenseller, by her former employer, Scottsdale Memorial Hospital. It involves questions concerning the construction of employment-at-

will contracts and whether the employer was required to follow certain published personnel policies relating to the discharge.

Ms. Wagenseller was hired by the hospital in 1977 to work in its emergency department and her duties were concerned with the coordination, training and evaluation of paramedics. One of her supervisors was another nurse, Kay Smith, who is an appellee in this case. Mrs. Smith and Ms. Wagenseller apparently enjoyed a normal working relationship until May of 1979. At about that time they went on a rafting and camping trip down the Colorado River with a large group of other people, many of whom worked for hospitals. According to Ms. Wagenseller, as the trip progressed Mrs. Smith urinated, defecated and bathed publicly, engaged in heavy drinking and "grouped up" with men from another boat. Some members of the rafting group composed a vulgar parody on the song, "Moon River," which concluded with the performers "mooning," that is dropping their pants and displaying their bare buttocks to the audience. Mrs. Smith and others also performed "Moon River" on one occasion at the hospital following the trip for the emergency room staff. When Ms. Wagenseller had been asked to join in, she had told the others to "forget it."

During the river trip Ms. Wagenseller had disassociated herself insofar as possible from the group and her friendship with Mrs. Smith cooled. According to Ms. Wagenseller this eventually led to a number of unfair accusations about her performance at work and her eventual discharge.

While the appellees concede that some of the events of the rafting trip occurred they believe that Wagenseller magnifies their significance. They admit the occurrence of the mooning incident at the hospital. The hospital, on the basis of alleged substandard job performance by Wagenseller, discharged her in October, 1979. Since the trial court granted summary judgment against the appellant we accept the facts and inferences as advanced by Wagenseller as if they were true. *Hall v. Motorists Insurance Corp.*, 109 Ariz. 334, 509 P.2d 604 (1973). As we note below, not all the established facts will support the inferences that Wagenseller would have the finder of fact draw.

Wagenseller sued various hospital administrators, Kay Smith and Scottsdale Memorial Hospital. She alleged that the hospital had denied her due process and had acted arbitrarily by firing her without following the procedures incorporated in its personnel manual. She also alleged that Smith had interfered with an advantageous relationship, that a termination for refusing to participate in the "Moon River" skit violated her first amendment rights, that her fourteenth amendment rights were also violated because she did not get a fair hearing before she was terminated and that the hospital breached her employment agreement for no justifiable reason. The trial court granted summary judgment for all defendants on all grounds.

## EMPLOYMENT–AT–WILL CONTRACTS

■ It is the general rule that an employee at will can be terminated at any time for any reason. *See The Dover Copper Mining Co. v. Doenges*, 40 Ariz. 349, 12 P.2d 288 (1932) (dealing with an independent contractor); *Larsen v. Motor Supply Co.*, 117 Ariz. 507, 573 P.2d 907 (App.1977). The appellant argues that all of these decisions really deal with questions of the duration of employment and not the reasons for termination. Her analysis in this respect requires an overly refined reading of the decisions and we reject it. For example, the court in *The Dover Copper Mining Co. v. Doenges, supra,* speaks of such contracts being "terminable at pleasure by either party," a phrase which connotes both the time of and the reasons for discharge.

## THE PUBLIC POLICY EXCEPTION

A number of well reasoned cases recognize that an employee-at-will cannot be terminated for a reason that contravenes some clear and important public policy. Good examples of these are found in *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973) (em-

ployee terminated for filing a workman's compensation claim); *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) (employee fired for refusing to participate in an illegal price fixing scheme), and *O'Sullivan v. Mallon*, 160 N.J.Super. 416, 390 A.2d 149 (Law Div.1978) (X-ray technician fired for refusal to illegally perform catheterization).

The appellant argues that similar public policies apply here. She lists the Arizona statutes proscribing indecent exposure, public sexual indecency, adultery, lewd and lascivious acts, disorderly conduct, criminal nuisance, and possession and use of dangerous drugs as expressions of important policies that Smith violated. We start with the observation that no matter what inference is put on the evidence there is nothing that will support the conclusion that Smith committed public sexual indecency, adultery, lewd and lascivious acts or any offense involving dangerous drugs. The appellees say that the appellant is precluded from arguing that the Moon River skit constituted the specific crime of indecent exposure and that she cannot now raise the issue for the first time on appeal. Whether or not Mrs. Smith's behavior was discussed in the trial court in terms of specific statutory violations, we will address the issue because the behavior was clearly characterized for the trial court as a violation of public policy.

While we can readily characterize the "mooning", alleged defecation and urination as tasteless behavior, a serious question arises as to whether they rise to a violation of A.R.S. § 13–1402, the statute which penalizes indecent exposure. That statute requires one to expose the genitals or anus in a manner that is reckless as to whether other reasonable persons present would be offended or alarmed by the act. Even assuming that these acts constitute a violation, in the context in which they occurred they appear to be relatively minor transgressions. The appellant was given a full opportunity to develop these matters and she has shown nothing about them

that presents a truly serious threat to the public morals, peace and welfare. It is difficult, indeed, to imagine any county attorney causing an arrest and prosecution for what Smith allegedly did. We agree with the New Jersey court when it wrote in *Pierce v. Ortho Pharmaceutical Corp.*, 166 N.J.Super. 335, 342, 399 A.2d 1023, 1026 (1979), *rev'd* 84 N.J. 58, 417 A.2d 505 (1980), that the public policy exception to the rule that employees terminable at will can be fired for any or for no reason should be "tightly circumscribed so as to apply only in cases involving truly significant matters of clear and well-defined public policy...."

What is most significant to us, however, is that the appellant was never required to participate in any objectionable conduct. Taking the evidence in the light most favorable to the appellant, there is simply no dispute that what happened was that appellant disapproved of her supervisor's tasteless behavior. When the supervisor felt the sting of that disapproval she reacted in a petty and unfair manner to the point where a personality conflict blossomed and the appellant was unfairly dismissed. We see no public policy considerations in this state of affairs that would call into play the exception to the rule that employees-at-will can be discharged for any reason.

The appellant argues that Ariz. Const. art. XX, which guarantees that no one shall be molested in person or property on account of his or her mode of religious worship or lack of the same, was violated because her disapproval of Smith's conduct was based on moral convictions founded in turn on religious beliefs. We think her argument is too attenuated. Wagenseller was not required to do or refrain from doing anything. While we can readily envision situations where the invocation of art. XX to protect a job would be perfectly appropriate, this case is not one of them. No one interferred with the appellant's mode of worship.

## MALICIOUS DISCHARGE

The appellant argues that the evidence of Smith's vengence and harassing tactics, coupled with the inaccuracy of the reasons given for appellant's discharge, support a cause of action for malicious discharge as recognized by *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974) and *O'Neill v. ARA Services, Inc.*, 457 F.Supp. 182 (E.D.Pa.1978). We do not find it necessary to determine whether Arizona recognizes a cause of action for malicious discharge. The appellant neither pled this cause of action nor presented it with sufficient precision as a separate issue to the court below to permit us to consider it now. *Payne v. Payne*, 12 Ariz.App. 434, 471 P.2d 319 (1970).

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

■ Wagenseller argues that it is a general rule of contract law that every contract contains an implied obligation of fair dealing. She acknowledges that *Moore v. Home Insurance Co.*, 601 F.2d 1072 (9th Cir.1979), which in turn relied on *Larsen v. Motor Supply Co.*, *supra*, would seem to exclude the application of the general rule to the employment-at-will context but then quotes the following passage from *Moore:*

This is not to say that the employer's contractual duty of fair dealing has no meaning.

601 F.2d at 1074, to infer that *Moore* somehow supports her position. In *Moore* the employer *conceded* that firing an employee solely to avoid the payment of pension benefits would violate a duty of fair dealing. *Moore*, in essence, is simply an expression of the public policy exception discussed above in a circumstance where such exception applies. While we might well hold that one cannot terminate an employee-at-will to avoid the payment of a pension because to do so violates an important public policy, that is not the case before us.

## TERMINATION MOTIVATED BY BAD FAITH, MALICE OR RETALIATION

■ The appellant proceeds on to argue that every employment-at-will contract contains an implied covenant not to terminate in bad faith or with malice or in retaliation. She relies on two cases. The first is *Cleary v. American Airlines, Inc.*, 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980) where eighteen years of longevity and accrued employee benefits were involved. It is clear that those factors, which are not really raised here, had a significant impact on the court's departure from the common law rule. The other case appellant relies on is on *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974), which held that such terminations are not in the best interests of the economic system or the public good. In the recent decision of *Leikvold v. Valley View Community Hospital*, 141 Ariz. 544, 688 F.2d 170 (1984), the Supreme Court of Arizona reserved judgment on the viability of a claim for bad faith discharge as approved in *Monge*. Division 2 of this court, in *Daniel v. Magma Copper Co.*, 127 Ariz. 320, 620 P.2d 699 (App.1980) specifically rejected the rule of *Monge* and carefully articulated good and sufficient reasons for doing so. We agree with Division 2.

## FAILURE TO FOLLOW PERSONNEL POLICIES

Scottsdale Memorial Hospital had a published personnel manual which read in pertinent part as follows:

POLICY

It is the policy of Scottsdale Memorial Hospital to provide fair and consistent discipline as required to assist with the improvement of employees' behavior or performance.

PURPOSE

To provide an opportunity for improvement of employees' behavior or performance through mutually agreed upon plans.

To provide an opportunity to clarify expectations and specific problems.

To outline steps that will be taken if behavior does not improve.

To provide guidelines for discipline so that all employees are disciplined consistently.

EXPLANATION

The Discipline Policy includes:
Verbal Performance Warning
Written Performance Warning
Letter of Formal Reprimand
Dismissal and Suspension

On October 31, 1979, Wagenseller was asked to resign because her work was supposedly inadequate. She responded by saying that she had been told nothing about the inadequacy of her work. She refused to resign and she was fired. About a week later, Wagenseller wrote a letter to her supervisor which she referred to as a "grievance". A hospital administrator responded that she was not an employee and could not file a grievance. About two weeks after sending the "grievance" letter Wagenseller met personally with the hospital's vice president in charge of administration and with its director of human resources. Thereafter, her termination was affirmed by letter. It is undisputed that the hospital did not follow its disciplinary policy of issuing a verbal warning, a written warning, and a letter of formal reprimand.

The appellant says that the hospital's failure to follow its own personnel rules and regulations creates a cause of action for breach of contract. That argument may well be true in many cases. She relies upon an isolated remark in *Dimond v. Samaritan Health Service,* 27 Ariz.App. 682, 684, 558 P.2d 710, 712 (1976) to the effect that:

> As far as a private hospital is concerned, it must follow its own rules and regulations and failure to do so justifies judicial intervention.

In that case a hospital employee who had been fired requested a hearing pursuant to the hospital personnel procedures and was accorded one. The employee contended that the personnel procedures did not meet constitutional standards. Division 2 of this court simply ruled that since the hospital was a private institution its procedures did not have to comply with constitutional safeguards. The court's comment regarding compliance with its own procedures was dicta predicated on *Shulman v. Washington Hospital Center,* 222 F.Supp. 59 (D.C.1963), *rev'd on other grounds,* 348 F.2d 70 (D.C.1965), where a similar statement was also dicta. Neither *Dimond* nor *Shulman* is very instructive because they do not address the details of the rule as it may or may not apply depending upon variations of fact.

What is more to the point is the recent decision of the Arizona Supreme Court in *Leikvold v. Valley View Community Hospital, supra.* In that case a hospital employee-at-will argued she was fired for "insubordination" because she sought a transfer and brought an action against the hospital on the theory that the hospital's personnel manual was a part of the employment contract. When Leikvold was hired there was no discussion of job security and she was not told that she would not be fired except for cause. She was, however, given a copy of the manual and told that the policies in it were to be followed. When she became director of nursing, she was told to follow the manual whenever an employee was terminated. The supreme court concluded that whether or not a personnel manual is a part of the employment contract is a question of fact and it remanded for trial on that issue. It elucidated as follows:

> We agree with Leikvold that personnel manuals can become part of employment contracts. Whether any particular personnel manual modifies any particular employment-at-will relationship and becomes part of the particular employment contract is a question of fact. Evidence relevant to this factual decision includes the language used in the personnel manual as well as the employer's course of conduct and oral representations regarding it. We do not mean to imply that all personnel manuals will become part of employment contracts. Employers are certainly free to issue no personnel man-

ual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason. Such actions, either not issuing a personnel manual or issuing one with clear language of limitation, instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual. However, if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it. Having announced a policy, the employer may not treat it as illusory.

■ We turn back to the facts of this case for consideration in light of *Leikvold*. Only an excerpt from the Scottsdale Memorial Hospital's policy manual on the subject of discipline is a part of the record. The manual relates that it is the hospital's policy to provide fair and consistent discipline to improve employee performance and that is the purpose of the manual, among other things, to provide guidelines for discipline so that all employees are disciplined consistently. It goes on to say:

Unless listed as an exception later in this policy, management shall use a 4-step disciplinary procedure to improve employee's behavior. The 4 steps include a VERBAL WARNING, WRITTEN PERFORMANCE WARNING, LETTER OF FORMAL REPRIMAND and EMPLOYEE NOTICE OF DISMISSAL. There is no requirement of days to separate one step from another.

Thereafter, the manual listed no less than thirteen exceptions to the four-step process that are considered major reasons for termination and another nineteen exceptions for minor infractions, including "insufficient or careless performance of duties" that may be cause for disciplinary action including dismissal. The final notation listed under exceptions to the four-step procedure is:

These major or minor infractions are not inclusive and are only guidelines.

There are two primary reasons that the hospital's failure to follow the four-step disciplinary process was not a violation of the appellant's contractual rights. First, there is little in the record that speaks to the issue of whether Ms. Wagenseller even knew of the existence of the personnel policies or considered them a part of her employment contract before she was fired. She acknowledged that she was not familiar with whether certain disciplinary procedures referred to in the manual were in effect at the time of her dismissal. While the manual itself bears the notation that it is to receive general distribution, the meaning of that phrase is not explained. Second, the provision which refers to the factors that will render the four-step disciplinary procedure unnecessary and then states that those factors are mere guidelines and not inclusive appears to create, by its terms, no rights at all. We think those provisions are clear enough and conspicuous enough so that it can be said as a matter of law that this manual is not a part of the employment contract.

We do not wish to be understood as saying categorically that such disclaimers will always be effective in every case. In *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980), the court recognized that if employers adopt such manuals and thereby create an environment in which the employee believes he will be treated fairly and like other employees the same becomes a part of the employment contract even though the employee does not know of or agree to the specific terms of the manual. If that point were carried further in the face of a history of consistent adherence to the manual procedures, it is arguable that the disclaimer would be ineffective by reason of waiver or estoppel. The resolution of that question must await a different record.

For the reasons expressed immediately above and because the point is raised for

the first time on appeal, we also reject Wagenseller's argument that the manual creates an implied promise that the hospital will not act arbitrarily in dealing with its employees.

## CONSTITUTIONALLY GUARANTEED RIGHTS

■ Wagenseller next argues that the hospital's action violated her first amendment right to freedom of expression and her fourteenth amendment right to due process. She says that the hospital is a quasi-public entity if it receives public funds, receives a public benefit, or has been incorporated into a governmental plan for providing hospital facilities to the public. Here, the evidence shows that Scottsdale Memorial Hospital was constructed entirely with private money, receives no public money except for medicare reimbursement and cooperates voluntarily with Arizona Emergency Medical Systems, Inc., an organization which receives public funds none of which, so far as the record shows, are provided to the hospital. The receipt of federal funds and the licensing provisions that hospitals are subject to do not convert them into institutions which exercise state action of a nature that would bring constitutional considerations into play. *See generally Hodge v. Paoli Memorial Hospital,* 576 F.2d 563 (3d Cir.1978); *Madry v. Sorel,* 558 F.2d 303 (5th Cir.1977); *Greco v. Orange Memorial Hospital Corp.,* 513 F.2d 873 (5th Cir.1975).

Wagenseller predicates her argument that her termination is subject to judicial review on *Peterson v. Tucson General Hospital, Inc.,* 114 Ariz. 66, 559 P.2d 186 (App.1976). In that case a doctor sued the hospital for denying his staff privileges. Despite the recommendations of the credentials committee and the department of general practice that privileges be extended, the executive committee recommended that privileges not be granted. Upon notification of this development the doctor requested a hearing before an ad hoc committee of the staff as provided for in the hospital's by-laws. Such a hearing was held and the ad hoc committee upheld the recommendation of the executive committee. Again, pursuant to the by-laws, the doctor appealed to the board of trustees which upheld the decision not to extend privileges. The doctor claimed that the refusal to grant staff privileges was wrongful because (1) the hospital did not adopt proper standards for making the determination, (2) the hospital's action was arbitrary and capricious, and (3) the hospital did not treat appellant's application in the same manner as those of other doctors who were granted privileges.

The court first considered the question of when the rules and acts of a hospital are subject to judicial review. It concluded that a hospital is "quasi-public" if it was constructed with public funds, receives public benefits, or has been sufficiently incorporated into a governmental plan for providing hospital facilities to the public. After examining a number of cases from other jurisdictions the court considered *Blende v. Maricopa County Medical Society,* 96 Ariz. 240, 393 P.2d 926 (1964), which held that where a doctor was denied membership in the medical society and was thus prevented from maintaining staff privileges in any hospital in Maricopa County, judicial intervention was justified because the control of a doctor's access to hospital facilities was the exercise of a quasi-governmental power. The court in *Peterson* thought that similar policy considerations were present in that case because the Tucson General Hospital had a virtual monopoly because it was the only hospital in the Tucson area in which an osteopathic physician could have staff privileges. It concluded that if the hospital had refused privileges based on factual findings supported by evidence and upon the application of a reasonable standard, then judicial inquiry should end. What is most important about *Peterson* in connection with appellant's argument on this point is that the court did *not* hold the hospital to constitutional standards.

■ It is significant that Wagenseller points to nothing in any state relationship

with the hospital that deals with how the hospital may or may not terminate its employees. This absence of a connection between the way in which the hospital may exercise some function of particular public interest and its personnel policies is of particular significance. *See Niedner v. Salt River Project,* 121 Ariz. 331, 590 P.2d 447 (1979). We also see a significant distinction between the termination of a job and the denial of a privilege that virtually precludes the pursuit of an entire career.

## TORTIOUS INFERENCE WITH CONTRACTUAL RELATIONSHIP

Wagenseller argues that she stated a cause of action against Smith for an intentional and unjustified interference with her contractual relationship. She relies on the facts we have already recited and the fact that Smith at one point told another supervisor that Wagenseller ought to be fired. Smith, on the other hand, argues that Arizona does not recognize such an action with respect to contracts or expectancies that are terminable at will.

■ Arizona law on the point is unsettled. Smith cites *Truax v. Bisbee Local No. 380,* 19 Ariz. 379, 171 P. 121 (1918), wherein a union encouraged a number of waiters who belonged to the union to strike their employer's business. The employer sued the union for interfering with its contractual rights and the court found for the union, stating that in the absence of a contract the employer had no right to complain. *Truax* has been weakened if not impliedly overruled by *Antwerp Diamond Exchange Inc. v. Better Business Bureau,* 130 Ariz. 523, 637 P.2d 733 (1981). There the supreme court adopted the reasoning of the court of appeals' opinions that discussed the tort of intentional interference with business relationship. The supreme court recognized the tort as defined in the *Restatement of Torts* § 766 (1939). The *Restatement* provides:

> Except as stated in § 698 [betrothal promises], one who, without a privilege to do so, induces or otherwise purposely causes a third person not to ... *enter into or continue a business relation with another* is liable to the other for the harm caused thereby.

(emphasis added). While *Antwerp Diamond* and the *Restatement* do not specifically concern employment-at-will contracts, we find the analogy persuasive. An employee working under an at-will contract has an expectancy that his employment will continue from day to day. We see no reason for granting parties about to enter a contract any greater protection than those who have entered a contract terminable at will. This conclusion derives support from *Truax v. Raich,* 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915) and from Prosser, *The Law of Torts* § 129 (4th ed. 1971). In *Raich* an employee at will was fired and in answer to the allegation that he had no property interest at stake the court held:

> The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others. The employee has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion and, by the weight of the authority, the unjustified interference of third persons is actionable although the employment is at will.

239 U.S. at 38, 36 S.Ct. at 9, 60 L.Ed. at 134.

Prosser states:

> The overwhelming majority of the cases have held that interference with employments or other contracts terminable at will is actionable, since until it is terminated the contract is a subsisting relationship, of value to the plaintiff, and presumably to continue in effect.

Prosser, *Law of Torts* § 129 at 932–33 (4th ed. 1971).

■ We must determine if Wagenseller has alleged the underlying elements of the cause of action and, if so, whether there are material facts in dispute on this issue. The plaintiff must prove five elements: 1) an existing contract between the plaintiff and a third party; 2) defendant's knowledge of the contract; 3) an intention-

al unjustified inducement to breach the contract; 4) a subsequent breach by the third party; and 5) resulting damage to plaintiff. *Ulan v. Vend-A-Coin Inc.*, 27 Ariz.App. 713, 558 P.2d 741 (1976). As we discuss in detail below, persons who are in a confidential relationship with an employer have a qualified privilege to interfere with an employee's contract or expectancy. This concept of qualified privilege is occasionally confused with the question of whether or not the person who breaches the contract is, in fact, a third party. Such confusion is most apt to arise in cases like this one, where the defendant alleged to have interfered is an agent or employee of the party who breached the contract.

▋ In the present case Smith was the employee of the hospital and with respect to Wagenseller was in a supervisory capacity. If Smith, as an agent of the hospital, was acting within the course and scope of her employment her actions, as a general rule, would be privileged. The real issue is whether this case falls within any exception to this general rule.

Arizona courts have considered similar questions before. In *Perry v. Apache Junction Elementary School Dist.*, 20 Ariz.App. 561, 514 P.2d 514 (1973), a school principal was dismissed by the school board. He filed a complaint alleging in part that the board members and school superintendent conspired to procure the breach of his contract. The court held "that agents and employees of a corporation cannot conspire with their corporate principal or employer when acting in their official capacities on behalf of the corporation and not as individuals for their individual advantage." 20 Ariz.App. at 564, 514 P.2d at 517.

In *Petroni v. Board of Regents*, 115 Ariz. 562, 566 P.2d 1038 (App.1977), the plaintiff was an assistant professor at the University of Arizona employed under a series of one year contracts. He was eventually denied promotion and tenure and sued on the theory, among others, that members of the board had tortiously interfered with his employment. The court, cit-

ing *Perry*, recognized the claim but found in favor of the defendants, holding:

> There was no evidence of any individual advantage to [the defendants] in expressing the negative opinions....

There is yet another Arizona case that bears on the question. In *Ong Hing v. Arizona Harness Raceway, Inc.*, 10 Ariz. App. 380, 459 P.2d 107 (1969), the director of a corporation was sued for inducing the corporation to breach a contract with a third party. This court said:

> The majority and better rule is that this liability follows to corporate directors, with one important proviso. Because of public policy, a director should be allowed to advance and protect legitimate interests of his corporation, its stockholders and creditors by discharging his corporate duties unhampered by the fear of personal tort liability. [citation omitted]. Therefore, the acts of such director should be privileged provided that the acts complained of were in good faith and the director believed that his acts were for the best lawful interest of the corporation.

10 Ariz.App. at 388, 459 P.2d at 115.

▋ Thus it appears that under the Arizona cases fellow employees and supervisors have a qualified privilege to bring facts or opinions to the attention of the employer bearing upon the fitness of another employee and to recommend or insist that an employee be fired. We must look to the law of other jurisdictions to determine the parameters of the privilege. We list four sets of circumstances, some of them overlapping, which delineate the privilege. We confine our discussion to the law as it applies to supervisors, although parts of the discussion would apply to co-employees or others in a confidential relationship to the person who terminates the employment. We conclude that:

1. If a supervisor has the absolute authority to fire an employee without consulting superiors the discharged employee has no cause of action. *See Georgia Power*

*Co. v. Busbin,* 242 Ga. 612, 250 S.E.2d 442 (1978) and cases cited therein.

2. If a supervisor (not having absolute authority to fire) acts solely to further his private advantage and not to further the interests of the employer, the privilege does not apply. *Mendelson v. Blatz Brewing Co.,* 9 Wisc.2d 487, 101 N.W.2d 805 (1960) (allegation that majority shareholder terminated manager to coerce a sale of stock at less than fair market value, and to secure manager's job for inexperienced son of majority shareholder, stated a cause of action); *Tash v. Houston,* 74 Mich.App. 566, 254 N.W.2d 579 (1977) (subordinate fired for spurning sexual advances of superior); *see also Perry v. Apache Junction Elementary School Dist., supra,* and *Petroni v. Board of Regents, supra.*

3. If a supervisor (not having the sole authority to fire) acts purely out of malice and ill will with no interest of the corporation in mind, the privilege does not apply. *See* Prosser, *supra,* § 129 at 943 n. 91 and cases cited therein. If the supervisor's purpose is proper the privilege applies even if the supervisor bears malice and ill will against the employee. *See* Prosser, *supra,* § 129 at 943 n. 93 and cases cited therein.

4. Where the statements of the supervisor that caused the employee's termination are false and defamatory and made with actual malice the privilege does not apply. *Ramsey v. Greenwald,* 91 Ill.App.3d 855, 47 Ill.Dec. 150, 414 N.E.2d 1266 (1980). This, in essence, is simply a nuance on the theme that the supervisor is liable if he acts with malice and ill will and not in interests of the employer. Stated otherwise, it is akin to the idea that a qualified privilege will not protect one who uses unreasonable or improper means to achieve an otherwise permissible goal. *See* Prosser, *supra,* § 115.

The record is ambiguous as to Smith's authority to fire Wagenseller. The evidence showed that Wagenseller worked in the emergency room department under a supervisor by the name of Steindorff. Smith was the director of the ambulatory division and there was some evidence that she had the right to supervise Steindorff. There was also evidence that Steindorff had the authority to hire and fire for the emergency room department. The testimony of the hospital's vice president for administration is equivocal as to whether Steindorff could fire her subordinates with impunity. Since the scope of Smith's authority over Wagenseller is unclear from the record, whether Smith has an absolute defense regardless of malice or motive has not been established.

We must therefore proceed to determine whether there is any set of facts under which Wagenseller could succeed. We readily dismiss any notion that Smith was acting solely for her own advantage in the same sense as were the defendants in *Mendelson* and *Tash.* There is simply no evidence from which that can be inferred.

There is, however, sufficient evidence in the record to infer that Smith bore Wagenseller ill will. Were the jury to find that Smith urged Wagenseller's termination for that reason alone, without any intent to advance her employer's interests, Wagenseller would be entitled to recover. There is yet another basis upon which Wagenseller could recover. If Smith's comments about Wagenseller's supposed substandard performance were false and malicious, that is, made with knowledge that they were false or with reckless disregard as to their truth, then Smith would be liable. *See Ramsey v. Greenwald, supra.*

A word of caution is in order. Many terminations, however good the cause, are preceded by a history of ill will between the fired employee and his supervisors or co-workers. Indeed, friction between employees may be good grounds, in and of itself, to terminate a worker. It would be poor policy to create a cause of action against co-employees where a worker is fired to eliminate squabbling. Indeed, we see nothing wrong with an employee who, acting in good faith, frankly states to an employer that he is unable to get along with a co-worker and lets the employer resolve matters as he sees fit. It is the conduct based

on nothing but malice and ill will, or the resort to impermissible means, that supports the cause of action. Since disputed inferences arise from the facts of this case, it was improper for the trial court to grant summary judgment against Wagenseller on her claim against Smith for interference with prospective advantage.

It is ordered affirming the judgment of the trial court in favor of all defendants except as to the defendant Smith on the second claim for relief in the complaint.

It is further ordered remanding this cause to the trial court for further proceedings on the second claim for relief.

HAIRE and OGG, JJ., concur.