Alfred M. STONE, Plaintiff,

v.

BANNER PUBLISHING CORP., Defendant.

Anthony S. LaPIANA, Plaintiff,

v.

BANNER PUBLISHING CORP., Defendant.

Nos. 87 Civ. 84, 87 Civ. 85.

United States District Court, D. Vermont.

Jan. 21, 1988.

---

William H. Kain, Williston Park, N.Y., for plaintiffs, Alfred M. Stone and Anthony S. LaPiana.

Andrew L. Hughes, Townley & Updike, New York City, for defendant, Banner Pub. Corp.

## MEMORANDUM DECISION

GAGLIARDI, Senior District Judge.

### Introduction

This is a defamation suit based on an article published in the Bennington Banner on April 22, 1981. The plaintiffs, New York residents, Alfred M. Stone and Anthony S. LaPiana claim that this article was defamatory and injured their reputation to the extent that they could no longer do business in Bennington and other areas in Vermont. The defendant, a Vermont corporation and publisher of the Bennington Banner, raises several defenses including substantial truth, privilege and lack of actual harm. The case was tried to the court in September, 1987. The following are the findings of facts and conclusions of law in accordance with Rule 52(a).

## Facts

Stone and LaPiana were partners in a business which put together cooperative advertising products. They created a booklet called the "Family Ledger," a recording ledger for household expenses and telephone numbers. Stone and LaPiana had previously run the Family Ledger program in another area. Their plan of operation entailed entering into a Distribution Agreement with one or more commercial businesses, such as a bank or insurance company under which the institution would distribute the ledger to its customers. The front cover usually consisted of an advertisement for the institution, with other advertisements placed by local merchants. The primary institution received its advertisement free and in exchange generally wrote a letter of recommendation to help solicit paid advertisements from local merchants. The income generated from the paid advertisements covered printing costs and furnished a profit for Stone and LaPiana.

On April 21, 1981, Stone came to Bennington to solicit banks and other community institutions to distribute Family Ledgers. To start the program Stone approached the manager of the Merchants Bank in Bennington, Elaine Colditz. She signed a Distribution Agreement and was told that LaPiana would contact her later. However, she would not write a letter of recommendation. When Stone pressured her to write the letter she became suspicious and after Stone left she called the Bennington Police Department and reported what had transpired with Stone. The police department dispatcher referred Colditz' call to Inspector Theodore Lanoue.

Inspector Lanoue conducted an investigation of Stone and LaPiana which he summarized in an Incident Report. Starting with some preliminary information from Colditz, and a Family Ledger business card which listed a Sayville, N.Y. address, Lanoue called the Bennington Chamber of Commerce and ascertained that the Cham-

ber had no knowledge of Stone or LaPiana. Lanoue also called the Chamber of Commerce in Sayville and learned that the Sayville Chamber had no knowledge of the business and was unable to confirm that the post office box listed on the Family Ledger business card belonged to either Stone or LaPiana. Lanoue concluded that the Family Ledger was a non-existent business and that Stone and LaPiana were soliciting funds as part of a fraudulent con game.

Shortly after finishing this brief investigation, at about 11:45 a.m., Lanoue called the Bennington Banner and issued a press release warning local merchants of this hoax. Lanoue was anxious for the warning to make the noon deadline for that afternoon's edition of the Banner. Lanoue's call was referred to Kyle Hughes, the Banner reporter who covered police matters and who routinely went to the police station to check police reports. Lanoue recounted the details of the investigation he had conducted and showed his report to Hughes. Hughes' own investigation of the facts largely duplicated Lanoue's efforts. Hughes called the Bennington Chamber of Commerce. He also spoke to someone at the bank. Hughes made an unsuccessful attempt to reach Family Ledger by phone.[1] He did not try to locate Stone or LaPiana in Bennington. Hughes made no independent investigation of the Family Ledger operation or of Stone and LaPiana before the article was published at about 1:00 p.m. that day.

Meanwhile, LaPiana arrived in Bennington a few hours after Stone. Stone had left a message with LaPiana's wife that he had made a Distribution Agreement with the Merchants Bank. LaPiana began soliciting advertisements from local merchants and was successful in selling one ad before the article was published.

The article reads:

---

**1.** Hughes' testimony at trial was that he had called directory information in Long Island but could not find a number for Family Ledger and so never called a phone number for the busi- ness. This contradicted his earlier statement in an affidavit that he had called the Family Ledger business phone number and that it was a discontinued number.

## POLICE WARN MERCHANTS OF POSSIBLE CON GAME

Bennington police today issued a warning to local merchants who may be approached by entrepreneurs selling advertisements in connection with the distribution of a "Family Ledger."

Police believe the scheme may be a con game, and noted that the two men in Bennington who may be selling the ads are doing so without the authorization of the Greater Bennington Chamber of Commerce.

Men who have identified themselves as Anthony S. LaPiana and A. M. Stone of "Our Family Ledger" of Sayville, N.Y., have approached a local bank and insurance agency seeking "authorization" to distribute free copies of the ledger through the institutions.

The letters of authorization will be used to solicit advertising contributions for the "Ledger," police believe, by giving unsuspecting merchants the impression that the bank and agency have given their blessings to the scheme.

Police have discovered that the telephone number of the home office of "Our Family Ledger" home office is out of order and the Sayville chamber of commerce has never heard of the business.

"We want to warn the merchants not to have anything to do with these people because it doesn't look like a legitimate offer," said Investigator Theodore Lanoue.

Lanoue said a similar ad solicitation in Bennington four months ago netted con men several thousand dollars. The men, saying they represented the Jaycees, solicited ads in Bennington, Barre and Rutland, and then left with much of the money they collected.

### Discussion

■ The elements of a private action for defamation are: (1) a false and defamatory statement; (2) some negligence or greater fault in publishing the statement; (3) publi-

cation; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm. *Lent v. Huntoon*, 143 Vt. 539, 470 A.2d 1162, 1168 (1983).[2] In this case, publication is clearly established. The court will discuss the other necessary elements individually.

### 1. *False and Defamatory Statement*

■ The issue here is whether the article falsely accuses the plaintiffs of running a "con game." The meaning of an allegedly defamatory publication must be taken from the whole publication. *Lancour v. Herald & Globe Ass'n*, 111 Vt. 371, 17 A.2d 253, 256 (1941); *Kinsley v. Herald & Globe Ass'n*, 113 Vt. 272, 34 A.2d 99, 101 (1943). Further the Vermont Supreme Court has recently emphasized that the headline of an allegedly defamatory article deserves special and sometimes separate consideration. *Burgess v. Reformer Pub. Corp.*, 146 Vt. 612, 508 A.2d 1359, 1363 (1986).

Here, the whole tone and structure of the article imply that the plaintiffs were in fact committing some kind of fraud. Phrases such as "Men who have identified themselves as Anthony S. LaPiana and A. M. Stone" and "unsuspecting merchants" along with the warning statements quoted from the police convey the idea that the plaintiffs were running a con game. The last paragraph which details an advertising fraud perpetrated four months earlier in Bennington taken with the rest of the statements concerning the plaintiffs imply that their advertising solicitation was a similar or related fraud. The headline standing alone implies a fraud.

The article is not saved by the attribution of almost all statements to the police. Vermont has adopted the republication rule of the Restatement (Second) of Torts, § 578 that one who republishes the defamatory words of another is liable as if he had originally published it. *Lancour*, 17 A.2d at 257 (citing Restatement of Torts § 578). *See also Cianci v. New Times Publishing Co.*, 639 F.2d 54, 60–61 (2d Cir.1980).

**2.** In his denial of summary judgment on Dec. 30, 1982, Judge Sifton of the Eastern District of New York, where this suit was originally brought, ruled that Vermont law would apply in this diversity suit.

Thus, even though the article accurately reflected the police report, the Banner would be liable for printing any defamatory statements given by the police.

At trial the plaintiffs showed that they were soliciting advertisements and distributors in Bennington for a legitimate cooperative advertising project and were not running a con game. The statement in the article relating to the Jaycees scam was inaccurate in that those con men never reached Bennington. More importantly, the plaintiffs had no connection with that fraud. Therefore, the overall accusation of the plaintiffs in the article was false.

### 2. Lack of Privilege

Defendant argues that the article was privileged by law as a fair and true report of an official proceeding, or under a police-reporting privilege. Both of defendant's privilege arguments fail.

■ Although Vermont allows a qualified privilege to fair, impartial, substantially accurate reports of *judicial* proceedings, such a privilege does not extend to a preliminary police investigation. *Lancour,* 17 A.2d at 259. In *Lancour,* the court reasoned that statements in police reports do not have the same quality of fairness or truthfulness as statements of fact resulting from a judicial investigation. *Id. See* Restatement (Second) of Torts § 611 comment e (publication of preliminary papers before any judicial action is taken is not within the privilege for the publication of official proceedings). Here, no judicial action was ever taken. The publication of statements which the Banner took from Inspector Lanoue and his investigation report are not privileged as a report of a judicial proceeding.

■ Similarly, the statements at issue here are not covered by any police-reporting privilege recognized in Vermont. In *Weisburgh v. Mahady,* 147 Vt. 70, 511 A.2d 304 (1986), the Vermont Supreme Court held that news media have a qualified privilege to report, in good faith, violations of the law or public misconduct justifying police interference. The Court stated: "News-dispensing media are privileged to publish actual facts as to the commission of a crime, the arrest, and the charges brought against a person suspected of a crime, as long as the statement does not assert that the person arrested is guilty of the crime." 511 A.2d at 306. In that case, the court found a report of a theft which mistakenly stated the value of goods stolen as $50,000 rather than $500 was privileged. Here, no crime was committed, no arrests were made and no charges were ever brought against the plaintiffs. The limited *Weisburgh* privilege does not apply to the facts reported here.

### 3. Negligence or Greater Fault

■ Under the United States Supreme Court's ruling in *Gertz v. Robert Welch,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974) a private plaintiff in a defamation suit must prove some fault on the part of the defendant. Vermont has acknowledged this but has not yet had the opportunity to apply the negligence standard in a defamation suit. In *Lent v. Huntoon,* the Vermont Supreme Court suggested that guidance in applying the culpability standard required by *Gertz* might come from the Restatement (Second) of Torts. *Lent v. Huntoon,* 143 Vt. 539, 470 A.2d 1162, 1168 n. 1 (1983).

The Restatement (Second) of Torts, § 580B frames the negligence standard in terms of whether the defendant had reasonable grounds for believing that the communication was true. Restatement (Second) of Torts § 580B comment g. Here Hughes may have had reasonable grounds for relying on Lanoue for specific facts such as the fact that Stone and LaPiana had not registered with the Chamber of Commerce. However, Hughes did not have reasonable grounds to rely on Inspector Lanoue's conclusion that a con game was in progress.

In *Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78, 80 (D.C.App.1980), the District of Columbia Court of Appeals upheld a jury finding of negligence on the part of the Evening Star for reporting an inaccurate statement broadcast over a po-

lice "hot line." In that case, the hot line falsely stated that the plaintiff's wife had been shot at home during an argument with her husband, when in fact, as the official police reports revealed, the shooting had been accidental. *Id.* at 82. Both the trial court and the Court of Appeals upheld the jury's finding that the newspaper's reliance on the hot line was unreasonable. *Id.* at 80. Here, Hughes' reliance on Lanoue's report and statements with little more did not provide reasonable grounds for Hughes to believe the article was true.

In *Antwerp Diamond Exchange of America, Inc. v. Better Business Bureau of Maricopa County, Inc.*, 130 Ariz. 523, 528, 637 P.2d 733, 738 (1981), the defendant Better Business Bureau published reports warning investors to "exercise caution" in reviewing the plaintiff's company and stating that the company had been charged with fraudulently misrepresenting investment potential and diamond quality. After a court hearing in which the plaintiff's company was cleared, the defendant reported, "It is our position that [the judge] did not verify in the court hearing the claim with respect to the investment potential." 130 Ariz. at 526–27, 637 P.2d at 736–37. The court found the defendant had not tried to obtain a copy of the judge's decision and stated: "There are sufficient facts alleged from which a trier of fact could find that the Better Business Bureau acted negligently in failing to ascertain and publish the true facts of the decision in Superior Court." *Id.* 130 Ariz. at 528, 637 P.2d at 738. *See also Liquori v. Republican Co.*, 8 Mass.App. 671, 396 N.E.2d 726, 729 (1979) (upholding jury finding of negligence where reporter falsely labeled plaintiff a criminal by substituting plaintiff's address from a telephone book for suspect's actual address which was easily obtainable from court records).

In this case, Hughes did no independent investigation of Stone and LaPiana or of how legitimate cooperative advertising might work. He never spoke to Colditz about the Distribution Agreement she had made with Stone and LaPiana. Hughes' quick check of the Bennington Chamber of Commerce, his phone call to the bank, and his unsuccessful attempt to reach someone at the Sayville phone number did not provide him with a reasonable basis to conclude that Stone and LaPiana were con men.

The Restatement suggests three factors which should be considered in applying the negligence standard. Restatement (Second) of Torts § 580B comment h. The first is the time element. The information in the article was current. However, the impending deadline which Hughes faced cannot excuse his failure to provide an accurate account of the plaintiffs' business. The second factor is the nature of the interests the Banner sought to protect by publishing the article. Protecting local merchants from a possible hoax is a valid objective for a newspaper. However, merchants are business people, not ordinary consumers, and should be accustomed to dealing with salesmen. Indeed, the involvement of the Chamber of Commerce in this case shows that local business people already had one source of protection in place.[3] Therefore, the Banner's interest in protecting merchants is not given great weight. The third factor is the extent of damage to the plaintiffs if the communication proved to be false. The damage which the article would cause to Stone and LaPiana was immediately apparent. In fact, it was the admitted intent of Inspector Lanoue, and to a lesser extent Hughes, to stop Stone and LaPiana from doing business in Bennington, at least temporarily. Thus, all three factors lead to the conclusion that the Banner was negligent in publishing the article.

Plaintiffs have established that the Banner published a false and defamatory article about them and that the Banner was

---

3. There was evidence at trial that the Bennington Chamber of Commerce encouraged all town merchants to refuse to do business with any salesperson not registered with the Chamber. However, it appears that the one merchant who purchased an ad from LaPiana did not follow the Chamber's advice and started to do business with LaPiana without checking to see if he had registered with the Chamber. This suggests that at least one merchant felt secure in making a business decision without outside "protection."

negligent in failing to ascertain the falsity of the article's implication. The issue remaining is whether the Banner article caused harm to the plaintiffs.

4. *Damages*

■ Without a showing of knowledge of falsity or reckless disregard for the truth, a defamation plaintiff is entitled to compensatory damages only for actual injury. *Gertz v. Robert Welch*, 418 U.S. 323, 349, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789 (1974); *Colombo v. Times–Argus Assn., Inc.*, 135 Vt. 454, 380 A.2d 80, 82 (1977); *Lent v. Huntoon*, 470 A.2d at 1170. Under *Gertz*, actual damage is not limited to out-of-pocket loss but can also include harm to reputation, personal humiliation and mental pain and suffering. *Gertz*, 418 U.S. at 350, 94 S.Ct. at 3012, *Lent v. Huntoon*, 470 A.2d at 1169–70 (citing *Gertz*). *See Time, Inc. v. Firestone*, 424 U.S. 448, 460–61, 96 S.Ct. 958, 968–69, 47 L.Ed.2d 154 (1976) (upholding jury award to defamation plaintiff for her mental anguish and anxiety caused by defendant's libel).

■ After the article was published, Stone and LaPiana were unable to do business in Bennington. At trial, the plaintiffs gave evidence of the profit they expected to gain from the completed Family Ledger program in Bennington. LaPiana testified that a minimum of eight to fifteen ads were necessary to publish the Family Ledger. Stone and LaPiana estimated that if they had sold the minimum number of ads, they would have received a net profit of $350 to $400 per person for four days of work. It is unclear whether, even without the Banner article, Stone and LaPiana would have sold enough ads to guarantee that profit. The Family Ledger program had been successful in New Jersey but had never been run in Vermont. The amount of lost profits for the Bennington Family Ledger is uncertain. Because the plaintiffs' costs in starting the program and their final profit are speculative, the court cannot award damages on this basis.

■ It is clear that the Banner article caused the plaintiffs great personal anxiety and humiliation and injured their reputa-

tion in the Bennington area. Both plaintiffs testified at trial as to their shock and anguish caused by the article. For this each plaintiff is entitled to the sum of $3,000.

■ Because plaintiffs did not establish malice on the part of the Banner, they are not entitled to punitive damages. *Gertz*, 418 U.S. at 350, 94 S.Ct. at 3012; *Lent v. Huntoon*, 470 A.2d at 1170.

### Conclusion

Plaintiffs have established the necessary elements of a defamation claim. Plaintiffs' motion for judgment is granted. Each plaintiff is awarded the sum of $3,000. Plaintiffs are entitled to their costs pursuant to Rule 54, Fed.R.Civ.P.

The clerk shall enter judgment accordingly.

So Ordered.