785 P.2d 242

James M. FURGASON,
Plaintiff–Appellant,

v.

Christopher CLAUSEN and Donrey, Inc.,
a Nevada Corporation, authorized to do
business in New Mexico as Donrey Out-
door Advertising Company, also dba
Donrey Media Group dba and/or pub-
lishing the Alamogordo Daily News,
Defendants–Appellees.

No. 10841.

Court of Appeals of New Mexico.

Oct. 10, 1989.

Certiorari Denied Dec. 5, 1989.

Lisa K. Durrett, Charles W. Durrett, Durrett, Jordan & Durrett, P.C., Alamogordo, for plaintiff-appellant.

Frank K. Wilson, Rory L. Rank, Wilson & Rank, Alamogordo, for defendants-appellees.

## OPINION

DONNELLY, Judge.

Appellant James M. Furgason appeals from an order granting summary judgment and dismissing his complaint for libel against defendants Christopher Clausen, Donrey, Inc., and the Alamogordo Daily News for publishing a false report of his arrest. We discuss: (1) whether the court erred in determining that the publication in question was protected by the fair-report privilege; (2) whether the district court erred in determining the status of appellant; and (3) propriety of summary judgment. We reverse.

Appellant is the owner and proprietor of "Furgi's Pub" in Alamogordo. He also was appointed to serve on an advisory committee chosen by the mayor to deal with issues involving alcoholism and driving while intoxicated (Mayor's Committee). On January 9, 1987, appellant's home was burglarized, and among the items stolen were his wallet and a pistol. Several weeks later, on January 22, 1987, a man identifying himself as James M. Furgason was arrested by a city police officer on charges of paint sniffing and carrying a pistol as a concealed weapon. The individual arrested was carrying a driver's license showing his picture but bearing the name, address, and other personal data of appellant. At the time of the arrest the man told police that he was 32 years of age, that he was unemployed, and that he had no vehicle.

The next morning defendant Clausen, a reporter employed by the Alamogordo Daily News, reviewed the arrest reports prepared by the city police. The newspaper customarily published reports of the names of persons arrested by the local police. On learning that the name James M. Furgason appearing on the arrest report was the same as that of appellant, Clausen discussed the arrest report with Detective Ray Bailey and Captain Truman Nix of the Alamogordo Police Department. Both officers confirmed that the person arrested had been identified as James M. Furgason.

Clausen also received a typed copy of a Crime Stoppers' news release from the city police soliciting information from the public concerning the burglary of appellant's home and describing the burglary as the crime of the week. The Crime Stoppers' news release stated that among the items stolen were appellant's wallet and a .357 magnum revolver.

Clausen prepared a news story for publication concerning the facts of the Furgason arrest, which was published in the January 23, 1987 noon edition of the Alamogordo Daily News. The headline and lead paragraphs of the article reported,

**Bar owner accused of sniffing paint**

A prominent local bar owner who serves on the Mayor's Committee for Driving While Intoxicated and Alcoholism was arrested Thursday night for abuse of chemical substance and negligent use of a deadly weapon.

James M. Furgason, 41, 1407 Rockwood, who owns the popular bar and package store, Furgi's, 817 Scenic Dr., was arrested at 9:45 p.m. Thursday night after allegedly being observed sniffing paint.

The news story also reported, among other things, that "[a]ccording to the report by Department of Public Safety officer Greg Cavelli, Furgason was sniffing paint in the covered restroom entrance of the 10th Street Conoco Service Station," that a search of Furgason revealed that he was carrying a .357 caliber revolver tucked into his waistband, and that following his arrest "Furgason was booked into the Otero County Jail under a $3,500 bond and is scheduled to be arraigned [sic] before [a magistrate judge] Friday afternoon."

Several hours after the newspaper was published, the city police, while attending the magistrate court arraignment, discovered that the person arrested and identified as James M. Furgason was an imposter, that he had falsely informed Officer Cavelli that he was James M. Furgason, and that the driver's license he had shown police was the driver's license which had been stolen earlier from appellant's home. The individual arrested was subsequently identified as Garland Erven and was charged with having burglarized appellant's residence. Subsequent investigation revealed that Erven had altered appellant's driver's license and placed his own photograph over the picture of appellant on the license.

Thereafter, in its January 25, 1987 edition the newspaper printed a front page story reporting that Erven had impersonated appellant by using a driver's license taken from appellant's wallet, which had been stolen during the burglary of appellant's home on January 9, 1987.

Appellant filed suit against defendants for defamation, alleging that the January 23 newspaper article was libelous and seeking actual and punitive damages.

On February 27, 1987, defendants filed a motion to dismiss the complaint for failure to state a claim or, alternatively, seeking summary judgment. After a hearing, the district court entered an order granting summary judgment. The order recited in part that the newspaper article which gave rise to this lawsuit was privileged under the fair and accurate report privilege, that the privilege was not abused, that appellant was a "limited public figure," that defendants did not act with malice, that defendants did not know the content of the news article was false or did not negligently fail to recognize that the article was false, and that defendants were entitled to summary judgment as a matter of law.

## I. FAIR AND ACCURATE REPORT PRIVILEGE

The news article which is the subject of this suit was written by Clausen using information obtained from the police arrest report, conversations with city police officials, information independently obtained by Clausen after inquiries posited to the city clerk, and information contained in the local telephone directory.

The first two paragraphs of the news article identified the person arrested as "James M. Furgason, 41, 1407 Rockwood, who owns the popular bar and package store, Furgi's, 817 Scenic Drive * * * after allegedly being observed sniffing paint." The headline together with the lead paragraph also identified the person arrested as a prominent local bar owner who served on the Mayor's Committee.

Appellant argues that the district court erred in determining his complaint was not actionable based on a finding that the news article was privileged under the fair and accurate report privilege. Stover v. Journal Publishing Co., 105 N.M. 291, 731 P.2d 1335 (Ct.App.1985), cert. denied, 484 U.S. 897, 108 S.Ct. 230, 98 L.Ed.2d 189 (1987), reaffirmed the fair report privilege as a defense in an action for defamation. As observed in Stover,

The essence of the fair report privilege is that no liability will attach for the republication of the defamatory state-ments so long as the republication is a fair and accurate report of an official or public proceeding. The Restatement (Second) of Torts § 611 (1977) articulates the privilege as follows:

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

Id. at 294, 731 P.2d at 1338.

■ Determination of whether a privilege applies to material alleged to be defamatory is a question of law to be decided by the court. Coronado Credit Union v. KOAT Television, Inc., 99 N.M. 233, 656 P.2d 896 (Ct.App.1982).

■ The fair report privilege protects against liability even though the publisher may not believe the material reported. Id. However, the privilege may be abused where the published account is discolored or garbled from that of the proceedings which are reported, or where the publisher draws conclusions or adds comments or insinuations of his own which are defamatory of the character of appellant. See Henderson v. Dreyfus, 26 N.M. 541, 191 P. 442 (1919); Stover v. Journal Pub. Co.; see also Moritz v. Kansas City Star Co., 364 Mo. 32, 258 S.W.2d 583 (1953); Haynik v. Zimlich, 30 Ohio Misc.2d 16, 508 N.E.2d 195 (1986). In order to qualify for the fair report privilege a newspaper is not required to reprint an official report verbatim; it may instead summarize or abridge its contents. Lavin v. New York News, Inc., 757 F.2d 1416 (3d Cir.1985); Appleby v. Dailey Hampshire Gazette, 395 Mass. 32, 478 N.E.2d 721 (1985).

In Bufalino v. Associated Press, 692 F.2d 266, 272 (2d Cir.1982), the court considered the breadth of the rule contained in Restatement (Second) of Torts Section 611 (1977), holding: "[o]nly reports of official statements or records made or released by a public agency are protected by the § 611 privilege. Statements made by lower-level employees that do not reflect official agen-

cy action cannot support the privilege."
(Emphasis in original.)

As observed in Restatement (Second) of Torts, *supra,* Section 611, comment h:

An arrest by an officer is an official action, and a report of the fact of the arrest or of the charge of crime made by the officer in making or returning the arrest is therefore within the conditional privilege covered by this Section. On the other hand statements made by the police or by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself and are not privileged under this Section.

■ In a defamation action the plaintiff bears the burden of proving abuse of a conditional privilege. *Haynik v. Zimlich; Mathis v. Philadelphia Newspapers, Inc.,* 455 F.Supp. 406 (E.D.Pa.1978).

■ In the instant case, with the exception of the name of the person arrested, the headline and first two paragraphs of the January 23, 1987 news article alleged by appellant to be defamatory consisted of matters which did not appear in the arrest report prepared by the city police. Instead, the headline and two lead paragraphs contained information concerning the appellant, his occupation and official position, and erroneously identifying appellant to be the same individual as the person arrested and charged by the police with the commission of two criminal offenses. Specifically the headline and first two paragraphs of the article stated factually that the arrestee was a "prominent local bar owner" who "serves on the Mayor's Committee for Driving While Intoxicated and Alcoholism" and that he was arrested on two criminal charges. The headline and article also stated as a fact that appellant, age "41," "who owns the popular bar and package store, Furgi's, 817 Scenic Drive, was arrested * * * after allegedly being observed sniffing paint." The material added by Clausen did not appear in the arrest report. The additionally added facts which were not contained in the arrest report conclusively identified the person arrested as being the appellant. Because most of the material contained in the first two paragraphs of the article was not drawn from the arrest report, the additional material and conclusions drawn by defendants affirmatively identifying appellant as the same person arrested and charged, are outside the permieters of the fair and accurate report privilege. *See* Restatement (Second) of Torts, *supra,* § 611, comment h. The remainder of the article, however, was either protected by the fair and accurate report privilege or is not challenged by appellant as being factually inaccurate or defamatory.[1]

■ Defendants also assert that the material contained in the headline and first two paragraphs of the article were within the scope of the privilege because the information was drawn from facts provided to Clausen by city police officers and from employees in the office of the mayor. We disagree. Not all information released by city or state officials to the media falls within the ambit of the fair and accurate report privilege. *See Bender v. City of Seattle,* 99 Wash.2d 582, 664 P.2d 492 (1983) (en banc). *See generally* Annotation, *Reliance on Facts Not Stated or Referred to in Publication, as Support for Defense of Fair Comment in Defamation Case,* 90 A.L.R.2d 1279 (1963). *See also* Annotation, *Defamation: Privilege Attaching To News Report of Criminal Activities Based on Information Supplied by Public Safety Officers—Modern Status,* 47 A.L.R.4th 718 (1986). As observed in *Bender,*

Some courts have afforded police officers an absolute privilege as to statements or communications made in the performance of official duties. *See, e.g., Hauser v. Urchisin,* 231 So.2d 6, 8 (Fla. 1970); *Catron v. Jasper,* 303 Ky. 598, 198 S.W.2d 322 (1946). Most courts,

---

1. The amended complaint of appellant only set out verbatim the headline and content of the first two paragraphs of the article.

however, hold that only a qualified privilege attaches. *See, e.g., Carr v. Watkins*, 227 Md. 578, 177 A.2d 841 (1961); *Krebs v. McNeal*, 222 Miss. 560, 76 So.2d 693 (1955); *Mullens v. Davidson*, 133 W.Va. 557, 57 S.E.2d 1, 13 A.L.R.2d 887 (1949). Statements of police officers in releasing information to the public and press serve the important functions of informing and educating the public about law enforcement practices. The right to inform the public, however, does not include a license to make gratuitous statements concerning the facts of a case or disparaging the character of other parties to an action.

*Id.* at 600–601, 664 P.2d at 504.

Except where a report of an arrest is privileged, as observed in the Annotation, *Actionability of False Newspaper Report That Plaintiff Has Been Arrested*, 93 A.L.R.3d 625, 626 (1979), newspaper reports which falsely state that the plaintiff has been arrested have generally been held by the courts to state a cause of action for libel because they tend to injure the reputation of the person who is the subject of the report, and tend to expose that person to disgrace, ridicule, or contempt. *See Dillard v. Shattuck*, 36 N.M. 202, 11 P.2d 543 (1932); *see also Roscoe v. Schoolitz*, 105 Ariz. 310, 464 P.2d 333 (1970); *Walker v. Associated Press*, 160 Colo. 361, 417 P.2d 486 (1966); *Rimmer v. Chadron Printing Co.*, 156 Neb. 533, 56 N.W.2d 806 (1953); *Luper v. Black Dispatch Pub. Co.*, 675 P.2d 1028 (Okla.Ct.App.1983); *Auto West, Inc. v. Baggs*, 678 P.2d 286 (Utah 1984).

Although the text of the article, excepting the two initial paragraphs, was drawn largely from information contained in the arrest report, the headline and two lead paragraphs consisted of information and conclusions obtained or reached by defendants extraneous to matters contained in the arrest report and did not consist of information in the form of a press release or other data generally disseminated to the public. Such material affirmatively indicated that appellant was in fact the same person arrested and charged with criminal conduct. We hold that, with the exception of the name of the individual arrested, the conclusionary material contained in the headline and two lead paragraphs of the article indicating that appellant was in fact the same person as the individual arrested, was not within the scope of the fair and accurate report privilege.

## II. STATUS OF APPELLANT

Our determination that the headline and portions of the article in question were outside the fair and accurate report privilege is not dispositive of whether the district court erred in granting defendants' motion for summary judgment. Defendants argue that even if a portion of the article falls outside the scope of the privilege, appellant is a limited public figure necessitating proof that the content of the article not covered by the privilege was false and that defendants published the material in question with actual malice. Defendants assert that their publication of the material alleged by appellant to be defamatory was the result of a mistaken identification and a misrepresentation by Erven. Defendants further contend that appellant has failed to come forward with any evidence in opposition to their motion for summary judgment indicating that a material factual issue exists as to whether they published such article maliciously.

■ The fact that a writer or publisher mistakenly or incorrectly identifies a party in published material is generally not a defense to an action for defamation. *See Mathis v. Philadelphia Newspapers, Inc.; Washington Post Co. v. Kennedy*, 3 F.2d 207 (D.C.Cir.1925); *Hatfield v. Gazette Printing Co.*, 103 Kan. 593, 175 P. 382 (1918). *See generally* Annotation, *Libel and Slander: Sufficiency of Identification of Plaintiff by Matter Complained of as Defamatory*, 100 A.L.R.2d 218 (1965). The focus instead turns in part on whether the published material was privileged, whether the material was false, whether its publication injured appellant, and the status of appellant. *See Kutz v. Independent Pub. Co.*, 97 N.M. 243, 638 P.2d 1088 (Ct. App.1981). *See also* Restatement (Second) of Torts § 580(A) & (B) (1977); Annotation,

*Actionability of False Newspaper Report That Plaintiff Has Been Arrested, supra.*

■ In *Marchiondo v. Brown*, 98 N.M. 394, 649 P.2d 462 (1982), our supreme court articulated the standard of proof required to establish a defamation action wherein the plaintiff is a public official or public figure. Determination of whether or not a person is a public figure is relevant in determining the required standard of proof, and the status of an individual as either a public figure, public official, or private person constitutes a question of law to be determined by the court. *Marchiondo v. Brown. See also Goodrick v. Gannett Co.*, 500 F.Supp. 125 (D.Del.1980); *Coronado Credit Union v. KOAT Television, Inc.*

■ Following *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the court in *Marchiondo* held that where a plaintiff in a defamation action is either a public official or a public figure, or where an allegedly defamatory statement involved a matter of public concern, it is "incumbent upon the plaintiff to prove that the defendant acted with actual malice (with knowledge of falsity or in reckless disregard of the truth)." *Id.* 98 N.M. at 402, 649 P.2d at 470. Reckless disregard of the truth is not measured by whether a reasonably prudent person would have published or would have investigated before publishing; there must be sufficient evidence to permit the conclusion that defendant in fact entertained serious doubts as to the truth of the communication. SCRA 1986, Civ. UJI 13–1009. In a defamation action where malice is required to be proven, malice must be established by clear and convincing evidence. *Sands v. American G.I. Forum of New Mexico, Inc.*, 97 N.M. 625, 642 P.2d 611 (Ct.App. 1982); UJI Civ. 13–1009. *See also* Annotation *Libel and Slander: What Constitutes Actual Malice Within Federal Constitutional Rule Requiring Public Officials and Public Figures to Show Actual Malice*, 20 A.L.R.3d 998 (1968).

■ Where plaintiff in a defamation action is neither a public figure nor a public official, he need only prove that the material published by defendants was a defamatory statement of fact and false, the information was not privileged, and that defendants negligently failed to recognize that the statement was false and proximately injured the plaintiff. *See* SCRA 1986, Civ.UJI 13–1002.

As shown by appellant's affidavit filed in support of his motion for summary judgment, he was named by the mayor on April 8, 1986, to serve on the Mayor's Committee. Appellant contends that his appointment to the committee did not result in his attaining the status of a public official or public figure and that, at the time the article in question was published, no meetings of the committee had ever been held, he was never given an oath, he never communicated with the mayor or other committee members concerning the committee, and that to his knowledge the committee was "otherwise non-existent until approximately one month ago [April 19, 1988]."

The terms "public figures" and "public officials" have not been precisely defined. In *Gertz* the Court stated that the standard enunciated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), which bars media liability for defamation of a public official absent malice, applies to both public officials and public figures. The Court then characterized *New York Times* as having defined public figures accorded constitutional protections as those "who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures." *Id.* 418 U.S. at 342, 94 S.Ct. at 3008. *Gertz* observes that "public figures" for the most part consist of two types: those who occupy positions of such persuasive power and influence that they are deemed public figures for all purposes, and [limited public figures, consisting of] those who have thrust themselves to the forefront of particular public controversy in order to influence the resolution of the issues involved. *See also* Restatement (Second) of Torts, *supra*, § 580(A), comment c; *Antwerp Diamond Exch. of Am., Inc. v. Better Business Bureau of Marico-*

**338**

*pa County, Inc.,* 130 Ariz. 523, 637 P.2d 733 (1981).

 Was appellant a limited public figure or public official by virtue of his ownership of a local business or his appointment to the Mayor's Committee? We conclude that he was not.

 In *Gertz* the Court stated the basis for determining who constitutes a "public figure" or "limited public figure" as follows:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.
>
> * * * Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.

*Id.* 418 U.S. at 351–352, 94 S.Ct. at 3012–13. *See also Bell v. Associated Press,* 584 F.Supp. 128 (D.D.C.1984). A person is not considered a "public figure" solely because he has been charged as a criminal defendant, *Wolston v. Reader's Digest Ass'n,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), has sought relief in the courts, *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), or is involved in a controversy reported by the media. Courts which have considered this issue have also recognized that an individual's prominence as a businessman, without more, does not relegate such person to the status of a public figure. *See Wilson v. Scripps–Howard Broadcasting Co.,* 642 F.2d 371 (6th Cir.1981); *Rancho La Costa,*

*Inc. v. Superior Court,* 106 Cal.App.3d 646, 165 Cal.Rptr. 347 (1980).

 *Gertz* sets out the test for determining whether an individual is a "public figure." The test includes determination of whether a public controversy exists and, if so, the nature and extent of the individual's participation in that controversy. Whether the nature and extent of a person's participation in a controversy subjects him to the status of a public figure is gauged by ascertaining the extent to which participation in the controversy is voluntary, the extent to which the individual has access to the channels of effective communication, and the prominence of his role in the controversy. *See also Curtis Pub. Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

 In determining whether appellant is a limited public figure for defamation purposes, examination focuses on whether the defamatory material concerns a public controversy or topic of legitimate public concern, together with the nature and extent of appellant's participation in the controversy. *Vassallo v. Bell,* 221 N.J.Super. 347, 534 A.2d 724 (App.Div.1987).

Tested by the criteria above, we conclude that the trial court erred in determining that appellant was a "public figure" or "limited public figure." Here, neither the fact that appellant's home was burglarized, the fact that appellant had been appointed to the Mayor's Committee, the fact that he was the owner of a liquor establishment, nor the fact that an individual was arrested who claimed to be him, elevated him to the status of a "public figure" or "limited public figure." Similarly, we determine that appellant was not a "public official" as defined by *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).

In *Rosenblatt* the United States Supreme Court discussed the parameters of who constitutes a public official, observing,

> It is clear * * * that the "public official" designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsi-

bility for or control over the conduct of governmental affairs.

\* \* \* Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply. [Footnotes omitted.]

*Id.* at 85–86, 86 S.Ct. at 675–76.

As discussed in *Rosenblatt*, public officials generally encompass those government employees who have, or appear to the public to possess substantial responsibility for or control over the conduct of governmental affairs. Here, there was no showing that members of the Mayor's Committee had any official status. Under the above criteria, appellant cannot be deemed a "public official."

In order to relegate an individual to the status of a "public official" within the context of *Rosenblatt, New York Times,* and *Gertz,* the individual's position must be one which elevates him beyond that of a mere private individual. The Court in *Gertz* discussed this requirement, noting,

Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater. [Footnote omitted.]

*Id.* at 344, 94 S.Ct. at 3009.

Defendants' answer brief points out that this is a case of mistaken identity and that there is no New Mexico precedent involving this kind of factual situation. Defendants urge that *Bell v. Associated Press,* 584 F.Supp. 128 (D.D.C.1984), be applied herein. In *Bell,* plaintiff, a professional football player and member of the 1979 National Football League Champion Pittsburg Steelers, was reported in a news story as "being sought on a bench warrant for alleged lewdness." In fact the person subsequently arrested was not the plaintiff Theo Bell, but another individual. The court dismissed plaintiff's complaint, finding, among other things, that plaintiff was a "public figure" and could not establish that defendant acted with malice in publishing this report. The instant case differs from *Bell* in that appellant is a private person and not a public figure.

Under UJI Civ. 13–1009, in order to support a claim of defamation, appellant must prove that defendants negligently published the communication and:

The defendant[s] \* \* \* negligently failed to check on the truth or falsity of the communication prior to publication.

The term "negligent" may relate either to an act or a failure to act.

An act, to be "negligent," must be one which a reasonably prudent person would foresee as involving an unreasonable risk of injury to the reputation of another and which such a person, in the exercise of ordinary care, would not do.

A motion for summary judgment in a defamation action necessarily involves determination of the substantive evidentiary standard of proof that would apply at a trial on the merits. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Applying the above authorities to the record herein, we determine that appellant at the time of the publication in issue was not a limited public figure nor a public official. Thus, for purposes of determining the standard of proof required to establish appellant's claim of defamation and the ruling on defendants' motion for summary judgment the factual inquiry turns upon the issue of whether defendants *negligently* published the article in question. *See* UJI Civ. 13–1003.

**III. PROPRIETY OF SUMMARY JUDGMENT**

 Based upon our determination as a matter of law that, because appellant was not a public figure, a limited public figure, or a public official, the constitutional standard of proof of actual malice is not appli-

cable to the publication in issue. *See Antwerp Diamond Exch. of Am., Inc. v. Better Business Bureau of Maricopa County, Inc.* Instead, the standard of proof required of appellant is that of negligence. UJI Civ. 13–1009. *See generally* Annotation, *State Constitutional Protection of Allegedly Defamatory Statements Regarding Private Individual,* 33 A.L.R.4th 212 (1984).

Defendants do not dispute that the article reporting the fact of appellant's arrest was erroneous. Defendants do deny that they acted negligently.

Questions of negligence are generally issues of fact for the fact finder. *Roscoe v. U.S. Life Title Ins. Co.,* 105 N.M. 589, 734 P.2d 1272 (1987); *Schear v. Board of County Comm'rs,* 101 N.M. 671, 687 P.2d 728 (1984). In *Mahona–Jojanto, Inc., N.S.L. v. Bank of New Mexico,* 79 N.M. 293, 442 P.2d 783 (1968), the supreme court succinctly stated the rules applicable to motions for summary judgment in defamation actions, observing that:

> all doubts as to the existence of a genuine issue of fact must be resolved against the movant, and * * * affidavits and depositions on file must be appraised in the aspect most favorable to the respondent. Also, all permissible inferences favorable to the respondent from the facts established must be considered in determining whether an issue of fact requiring trial exists.

Moreover, where reasonable minds may differ on the issue of whether defendants were negligent summary judgment is not proper and the matter must be resolved by the finder of fact. *See Trujillo v. Treat,* 107 N.M. 58, 752 P.2d 250 (Ct.App.1988); *see also Mathis v. Philadelphia Newspapers, Inc.*

Summary judgment being an extreme remedy, is to be employed with caution and cannot be substituted for trial on the merits where issues of material fact are found to exist. *Jelso v. World Balloon Corp.,* 97 N.M. 164, 637 P.2d 846 (Ct.App.1981); *Mahona–Jojanto, Inc., N.S.L. v. Bank of New Mexico.* Similarly, where affidavits or depositions are used to resist summary judg-

ment and statements in the deposition give rise to conflicting inferences concerning factual issues, summary judgment should not be granted. *Mahona–Jojanto, Inc., N.S.L. v. Bank of New Mexico. See also National Excess Ins. Co. v. Bingham,* 106 N.M. 325, 742 P.2d 537 (Ct.App.1987).

■ Here, appellant in response to the motion for summary judgment, relied in part upon the depositions of the defendant Clausen. Clausen testified, among other things, that at the time he wrote the article in question he had a copy of the Crime Stoppers' report detailing facts concerning the prior burglary of appellant's home. The Crime Stoppers report also indicated that among the items taken from appellant's home were a pistol and his wallet. The police arrest report indicated that the person arrested had in his possession a pistol similar to that taken from appellant's home in the prior burglary. Clausen additionally stated in his deposition that when he read the arrest report he "noticed that [the age of the individual arrested], if you use date of birth, would be 41, but the officer had written 32 in the space that says what his age actually was." Clausen indicated he concluded this discrepancy was "probably" merely a math error. Clausen also testified that at the time he wrote the initial article he did "not have knowledge that [the person who was arrested] ever represented himself as being the owner of Furgi's."

A review of the record before us indicates that appellant's response to the motion for summary judgment reveals the existence of conflicting material issues of fact concerning whether defendants negligently reported that appellant was in fact the same person arrested for substance abuse and negligent use of a deadly weapon, so as to preclude summary judgment. In considering a motion for summary judgment, the court must view all matters presented and considered by it in a light most favorable to the party opposing summary judgment so as to support the right to a trial on the issues. *Gonzalez v. Gonzalez,* 103 N.M. 157, 703 P.2d 934 (Ct.App.1985). Summary judgment is not appropriate to

determine an issue of fact, but to determine if one exists. *Pharmaseal Laboratories, Inc. v. Goffe*, 90 N.M. 753, 568 P.2d 589 (1977). The fact that contradictory inferences may be drawn from the testimony of Clausen concerning whether defendants negligently identified appellant as the same person who was arrested and criminally charged by the police renders summary judgment improper. *See Knapp v. Fraternal Order of Eagles*, 106 N.M. 11, 738 P.2d 129 (Ct.App.1987). The issue of defendants alleged negligence cannot properly be resolved as a matter of law but is a matter to be determined by the trier of fact.

The order of summary judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

IT IS SO ORDERED.

APODACA, J., concurs.

HARTZ, J., dissents.

HARTZ, Judge (dissenting).

I respectfully dissent. I would affirm the district court.

Although I question the majority's conclusion that plaintiff was not a limited public figure,[1] I would rest affirmance on other grounds. I believe that defendants are not liable for two independent reasons: (1) their article was protected by the common law privilege to publish a fair report of an official public record, and (2) they did not act with the degree of fault required for liability to be imposed.

Both the fair-report privilege and the requirement of fault derive from constitutional principles and public policy of the utmost importance to a free society. A wooden application of these legal rules can significantly diminish the protection they provide to a vigilant press. Because I believe that the majority opinion imposes an excessive burden on the news media, I respectfully dissent.

## A. THE FAIR–REPORT PRIVILEGE

As this court recently stated, "The essence of the fair report privilege is that no liability will attach for the republication of * * * defamatory statements so long as

1. The record on this point is not as developed as it might be. The matter was first raised by defendants in their rebuttal at oral argument on their summary judgment motion. Nevertheless, it appears that plaintiff was a limited public figure with respect to the issue of substance abuse. As the majority states, whether a person is a limited public figure with respect to a controversy is determined by the extent to which that person's participation in the controversy is voluntary and the extent to which that person has access to channels of effective communication. *See Hutchinson v. Proxmire*, 443 U.S. 111, 133–36, 99 S.Ct. 2675, 2687–88, 61 L.Ed.2d 411 (1979). Plaintiff seems to have met both tests. He voluntarily involved himself in the issue in two respects. First, as stated in his affidavit, he called the mayor of Alamogordo to ask to serve on the Mayor's Committee for Driving While Intoxicated and Alcoholism. He was appointed to the committee on April 8, 1986, and reappointed on October 14, 1986. Although there had been no meetings of the committee from the time of his appointment until the time of the article on January 23, 1987, the committee was not a total non-entity. It had met on April 2, 1986, the week before his original appointment. Also, it received enough attention from the media that when reporter Clausen saw the arrest record, he recognized Mr. Furgason as a member of the mayor's committee. Second, plaintiff was not merely the owner of a local business. He injected his name into the public eye with respect to his liquor establishment by naming the business "Furgi's" and, apparently, by spending substantial sums on advertising, including $1,000 a month on newspaper ads. Plaintiff thus intentionally injected his name and personality into the public consciousness as both a purveyor of liquor and as a public-spirited citizen working to control the abuse of that substance. (I do not in any way mean to criticize these actions by plaintiff. Such conduct may be not only good marketing but also good citizenship. Yet most persons who, because of their status, have the burden of proving actual malice in order to recover for libel could be termed good citizens.) With respect to plaintiff's access to the media, although the record is inadequate on this issue, one would expect that plaintiff had the access necessary to rebut any misrepresentations against him. Not only was he a substantial advertiser, he was also apparently a well-known local personality. In this regard, it is of some interest that a retraction appeared on the front page of the next edition of the paper (the Sunday paper) after the inaccurate story about plaintiff appeared on the back page of the newspaper. *Cf. Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264 (3d Cir.1980) (meat market that advertises a great deal is limited public figure with respect to story attacking wholesomeness of the meat it sells).

the republication is a fair and accurate report of an official or public proceeding." *Stover v. Journal Publishing Co.*, 105 N.M. 291, 294, 731 P.2d 1335, 1338 (Ct.App. 1985), *cert. denied*, 484 U.S. 897, 108 S.Ct. 230, 98 L.Ed.2d 189 (1987). We adopted the formulation of the Restatement (Second) of Torts Section 611 (1977), that an article concerning an official action or proceeding is privileged if the article "is accurate and complete or a fair abridgement of the occurrence reported." The majority agrees that articles based on official reports of arrests may come within the privilege. *See Mathis v. Philadelphia Newspapers, Inc.*, 455 F.Supp. 406 (E.D.Pa.1978); *Steer v. Lexleon, Inc.*, 58 Md.App. 199, 472 A.2d 1021 (1984); *Biermann v. Pulitzer Publishing Co.*, 627 S.W.2d 87 (Mo.App. 1981); Restatement, *supra*, § 611 comment h. *Cf. Short v. News–Journal Co.*, 58 Del. 107, 205 A.2d 6, *aff'd*, 58 Del. 592, 212 A.2d 718 (1965) (IRS report of assets seized).

1. *Constitutional and Public Policy Underpinnings*

According to some commentators, the Constitution mandates the fair-report privilege. *See* Hill, *Defamation and Privacy Under the First Amendment*, 76 Colum.L. Rev. 1205, 1219–20 (1976); Restatement, *supra*, § 611 comment b ("If the report of a public official proceeding is accurate or a fair abridgment, an action cannot constitutionally be maintained, either for defamation or for invasion of the right of privacy."). *See generally Medico v. Time, Inc.*, 643 F.2d 134, 143–46 (3d Cir.1981) (discussing, without adopting, view that there is a constitutional fair-report privilege). Although the United States Supreme Court has not reached the question of whether the Constitution requires adoption of the privilege in its totality, it has adopted the core of the privilege, using language that recognizes the values supporting the privilege as a whole. In *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the Court held that the first and fourteenth amendments to the Constitution prohibit imposition of liability upon a television station for accurately reporting a statement in an official public record. The parents of a deceased rape victim sued for invasion of privacy when the victim's name was reported by the station. The Court wrote: "At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records." *Id.* at 496, 95 S.Ct. at 1047. In explaining this result, the Court wrote:

[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally * * * *

* * * The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions ... are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government.

*Id.* at 491–92, 95 S.Ct. at 1044–45. *See The Florida Star v. B.J.F.*, —— U.S. ——, 109 S.Ct. 2603, 2612, 105 L.Ed.2d 443, 458–59 (1989) (reproduction of police news release that named plaintiff as rape victim is constitutionally protected, despite state statute barring media publication of names of victims of sexual offenses).

To be sure, the information broadcast in *Cox* was not only an accurate report of official information, it was also true. In any case, *Cox* does not suggest that the Constitution protects every report, however inaccurate, regarding an official record or proceeding. The quoted passages do, however, reflect the value that our society and

our Constitution place on news reports of official business, particularly the business of law enforcement.

Three important components of the common law privilege are corollaries to the propositions stated in *Cox*. First, because of the public's need to evaluate the administration of government, reporting official government statements is important even when the government is wrong. This corollary is one of the reasons justifying the rule that "[t]he fact that statements made in the proceedings were false will not upset the privilege, not even when the reporter knew that the statements were false and reported them anyway." *Stover v. Journal Publishing Co.*, 105 N.M. at 294, 731 P.2d at 1338. *Accord* Restatement, *supra*, § 611 comment a.

Second, for the press to assist the public in evaluating government action, it must enjoy a privilege to supplement its report of an official proceeding or record with accurate background information. *See El Greco Leather Prods. Co. v. Shoe World, Inc.*, 623 F.Supp. 1038, 1043 (E.D.N.Y.1985) (addition of background material did not remove article from protection of statutory fair-report privilege), *aff'd on other grounds*, 806 F.2d 392 (2d Cir.1986). Certainly it is in the public interest for the press to scrutinize who it is that the police are arresting. "Where there is no such scrutiny—as is true in some totalitarian countries—individuals sometimes disappear without a trace and without public knowledge or accountability." *Bell v. Associated Press*, 584 F.Supp. 128, 130 (D.C.Cir. 1984). Under the common law, a conditional privilege is abused by publishing additional defamatory matter only if the additional defamatory matter is unprivileged. Restatement, *supra*, § 605A. True statements are privileged, *id.* at Section 581A, so they can always be added without jeopardizing a conditional privilege. Although the fair-report privilege is not generally considered a conditional privilege, *see id.* at Section 599 comments a and c, the same rule should apply with respect to supplementing a fair report with truthful matter. *Cf. id.*, § 611 comment a (fair-report privi-

lege is broader in scope than the conditional privileges).

Third, the privilege should not be limited to verbatim reproductions of a public proceeding or record. *Cox* spoke of the role of the press to present the facts of government operations "in convenient form." 420 U.S. at 491, 95 S.Ct. at 1044. The press must be permitted to abridge the record and to convey the record with literary style that can capture the reader's attention. So long as the press preserves the gist or "sting" of the official record, the privilege should apply. Because the concept of the "sting" of an official record is central to my disagreement with the majority, I discuss it at some length.

### 2. Sting

As already noted, *Stover* adopted the Restatement view that the fair-report privilege applies if a news article "is accurate and complete or a fair abridgement of the occurrence reported." Restatement, *supra*, § 611. "It is not necessary that [the article] be exact in every immaterial detail or that it conform to that precision demanded in technical or scientific reporting." *Id.* at comment f. The privilege fails only if the article "convey[s] an erroneous impression." *Id.* A shorthand expression for this doctrine is that the privilege applies if the article preserves the "sting" of the official record. *See Ricci v. Venture Magazine, Inc.*, 574 F.Supp. 1563, 1570 (D.Mass.1983); *Haynik v. Zimlich*, 30 Ohio Misc.2d 16, 21, 508 N.E.2d 195, 200 (Ohio Com.Pl.1986).

A few examples of errors or omissions that did not defeat the fair-report privilege may be instructive. In *Crittendon v. Combined Communications Corp.*, 714 P.2d 1026 (Okla.1985), a television station reported on a malpractice trial in which a gynecologist was accused of performing an unnecessary hysterectomy. The station reported that the plaintiff contended that the removed uterus was "perfectly healthy," whereas plaintiff's expert witness admitted that the uterus actually had a minor cervical irritation. But the expert testified that the abnormality occurs in over ninety percent of women and that nothing in the

pathologist's report justified a hysterectomy. The court stated that the sting of the broadcast was accurate. In *Dudley v. Farmers Branch Daily Times*, 550 S.W.2d 99 (Tex.Civ.App.1977), the privilege protected an article reporting that plaintiff had been charged with the theft of property worth $168,000, when the official record showed that the charge was only for theft of property worth more than $50 and plaintiff claimed that the property was worth less than $7,000. An accurate report would have had the same sting.

Two other cases illustrate the protection of the privilege despite omission of "exculpatory" matter. The plaintiff in *Sciandra v. Lynett*, 409 Pa. 595, 187 A.2d 586 (1963) was stopped by New York State Police during the famous Apalachin meeting of alleged organized crime figures. The plaintiff complained about a news story taken from an official state report of the meeting. The story omitted information in the report, such as (1) plaintiff's having been released by the state police without charges being filed and (2) his birth date. (The birth date would have revealed that he was too young to have been the person convicted of a rape attributed to him in both the official report and the news story.) Yet the court held that the summary was fair and substantially correct. In *Ricci v. Venture Magazine, Inc.*, the defendant published an article stating that the plaintiff had threatened a witness at a trial; the article did not report that the plaintiff's attorney had objected at trial to the characterization of the plaintiff's gesture as a threat and had disputed the accusation. Judge Robert Keeton, a noted authority on tort law, held that the article need not contain such contrary assertions. He explained:

> [T]he requirement of fairness and accuracy extends only to matter relevant to a claimed defamatory sting—that is, to matter bearing upon whether the communication is reasonably susceptible of interpretation in a derogatory sense....
>
> \* \* \* \* \* \*
>
> \* \* \* [A] "fair and accurate" report need be neither exhaustive in detail nor perfectly precise in language.... Media reports [of trials] may permissibly focus on the more dramatic occurrences, to the exclusion of the less interesting.

*Id.* at 1567. The test is whether an ordinary reader could reasonably draw a more derogatory conclusion from the abridgement than could reasonably be drawn from the complete report:

> [A]pplying a common sense standard of expected lay interpretation of the report, I conclude that it could not be found that the abridgement was an unfair one \* \* \* \* The critical question is whether a report of a trial occurrence can reasonably be interpreted as describing the occurrence in a way that conveys a materially greater defamatory sting than would be conveyed by a technically correct and less abridged report. If not, the report has not offended the fairness requirement. A full report of all the details of this incident, including the two eyewitness reports, the claims that the gesture was a threat, and the judge's decision to sever, as well as Ricci's attorney's version, would be no less susceptible of being read as conveying a sting derogatory to plaintiff than was the abridged report actually made.

*Id.* at 1568.

### 3. The Fair–Report Privilege Protects Defendants in This Case

Whether an allegedly libelous statement is privileged is a question of law for the court to determine. *See Marchiondo v. Brown*, 98 N.M. 394, 400, 649 P.2d 462, 468 (1982). Applying the principles discussed above to the facts of this case, I would find the article in question to be privileged as a matter of law. Comparison of the article with the arrest record reveals that the article was in substance nothing more than a combination of (1) an abridgement of the official arrest report, and (2) accurate information concerning plaintiff. Because the abridgement preserved the sting of the arrest report, the article is protected by the fair-report privilege.

The arrest record states that the arrestee was James M. Furgason, residing at 1407 Rockwood, Alamogordo, New Mexico, and

born on June 4, 1945. Assume that the arrest record contained no further description of the arrestee. Then the article unquestionably would be privileged. The portion of the article on which plaintiff bases his claim is as follows:

A prominent local bar owner who serves on the Mayor's Committee for Driving While Intoxicated and Alcoholism was arrested Thursday night for abuse of chemical substance and negligent use of a deadly weapon.

James M. Furgason, 41, 1407 Rockwood, who owns the popular bar and package store, Furgi's, 817 Scenic Dr., was arrested at 9:45 p.m. Thursday night after allegedly being observed sniffing paint.

A second version of the same two paragraphs might read:

Official police records report that a James M. Furgason, born June 4, 1945, of 1407 Rockwood, was arrested Thursday night for abuse of chemical substance and negligent use of a deadly weapon. He was arrested after allegedly being observed sniffing paint.

James M. Furgason, 41, of 1407 Rockwood owns the popular bar and package store, Furgi's, and serves on the Mayor's Committee for Driving While Intoxicated and Alcoholism.

Everything in the second version is either an accurate and *complete* report of the hypothesized arrest record (at least with respect to the identity of the arrestee) or is unchallenged as being true. No one could doubt its being privileged. Juxtaposing a complete report of an official record and true information cannot subject a journalist to liability. Yet if the second version is privileged, so must be the published paragraphs. Although in retrospect one can see differences between the two paragraphs from the published article and the second version, the differences would escape the ordinary reader. The sting of the two versions is identical. Nor does adding the headline, "Bar owner accused of sniffing paint," change the sting. The chief difference between the two versions is that the one appearing in the newspaper is bet-

ter written. That should not be the source of liability. *Cf. Read v. News–Journal Co.*, 474 A.2d 119, 121 (Del.1984) ("An action for defamation cannot be premised solely on defendant's style or utilization of vivid words in reporting a judicial proceeding.") If we require news articles to be written with meticulous precision, the resulting soporific style would hinder the dissemination of information to the public more than if *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) were overruled. In particular, I would not require the lead paragraph to say that the information comes from an official police report. Not only does the third paragraph of the story explicitly state, "According to the report by Department of Public Safety Officer Greg Cavelli," but also the reader would naturally infer that the source of the information was the police, rather than personal observation by the reporter. *See Medico v. Time, Inc.*, 643 F.2d at 139 n. 17; *Ricci v. Venture Magazine, Inc.*, 574 F.Supp. at 1570; *Foley v. Lowell Sun Publishing Co.*, 25 Mass.App.Ct. 416, 519 N.E.2d 601 (1988), *aff'd*, 404 Mass. 9, 533 N.E.2d 196 (1989).

The difficulty in this case, however, is that the public records available to defendant Clausen when he wrote the article included more than the name, address, and date of birth of the arrested person. The arrest record stated that the arrestee was unemployed, thirty-two years old, six feet six inches tall, one hundred sixty-five pounds in weight, with brown hair, blue eyes and a fair complexion. It listed among the property on the arrestee a brown wallet and thirty-four cents in change. In addition, that same morning the Public Safety Department gave Clausen, apparently coincidentally, a Crime Stopper news release reporting a burglary a month earlier at Furgason's home. Reported stolen in the burglary were, among other items, a revolver and a wallet. The article omitted this information; it "abridged" the public record. An astute observer who knew of the omitted information might have surmised that the arrestee was not the prominent bar owner, but was

the individual who stole the bar owner's wallet and drivers' license. Thus, one could claim that the abridgement was unfair because it omitted "exculpatory" information that might have directed suspicion away from plaintiff.

Nevertheless, the fair-report privilege protects defendants. The article was a fair abridgement of the official record because it conveyed the sting of the police report. The sting of the official arrest report in this case was that "James M. Furgason" was arrested for sniffing paint and other crimes. That sting is not altered by the inclusion of other information in the arrest record. On the contrary, the information describing the arrested person confirms more than it undermines his identification as plaintiff. The identifying information that was most precise—and presumably most reliable—pointed to plaintiff: the full name (with the unusual spelling of the last name), home address, birth date and social security number were all those of plaintiff. Although there were some discrepancies (such as an incorrect age and employment status), these could be explained as a consequence of the arrested person's intoxication, his desire to avoid—or at least delay—publicity injuring his business, or error by the arresting officer. In any event, an article can be privileged without including every detail from the official report that might lead a reader to question the sting. *See Ricci v. Venture Magazine, Inc.* What is important is that inclusion in the article of a verbatim copy of the arrest record would not materially change what the ordinary reader would conclude from the article. *See Biermann v. Pulitzer Publishing Co.* (privilege applies to report of arrest, even though some official documents might cast doubt on identity of plaintiff as the person arrested).

My view is not affected by the existence of the Crime Stopper news release. That release and the arrest report are sufficiently distinct that reference to the release was not required in the article concerning the public record of the arrest. To be protected by the fair-report privilege in reporting on an official action, a publisher should not have to include a fair abridgement of every related occurrence. Imposition of such a requirement would inevitably burden the free flow of important information to the public. Moreover, even if it were necessary to measure the published article against both the arrest report and the Crime Stopper release, a "full report * * * would be no less susceptible of being read as conveying a sting derogatory to plaintiff than was the abridged report actually made." *Ricci v. Venture Magazine, Inc.,* 574 F.Supp. at 1568. A "full report" would still imply that plaintiff was the person arrested.

If I am correct in my characterization of the sting of the arrest record, then the entire article must be privileged. Everything in the article not taken from the arrest record was accurate information about James M. Furgason, 41, of 1407 Rockwood or was otherwise unchallenged in this lawsuit. As already stated, adding truthful information to a fair summary of an official report should not subject the publisher to liability. News media frequently provide the useful service of putting official statements or proceedings in context. Background information on a person who is the subject of an official accusation is generally newsworthy. The fair-report privilege should not be construed so as to discourage the reporting of such information.

## B. FAULT OF DEFENDANTS

### 1. *Constitutional Basis of the Fault Requirement*

Defendants are not liable also because they acted without the required fault in publishing the article. In New Mexico the plaintiff must prove negligence to recover for defamation. *Marchiondo v. Brown,* 98 N.M. at 402, 649 P.2d at 470. The negligence standard follows from the constitutional requirement of fault. *See id.; The Florida Star v. B.J.F.,* —— U.S. at ——, 109 S.Ct. at 2612, 105 L.Ed.2d at 459 (liability for defamation of private figures is evaluated under a standard of "ordinary negligence"). The United States Supreme Court explained the rationale behind that

requirement in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340–41, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974):

Although the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate * * * * [P]unishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press. Our decisions recognize that a rule of strict liability that compels a publisher or broadcaster to guarantee the accuracy of his factual assertions may lead to intolerable self-censorship. Allowing the media to avoid liability only by proving the truth of all injurious statements does not accord adequate protection to First Amendment liberties. As the Court stated in *New York Times Co. v. Sullivan, supra,* [376 U.S.] at 279: [84 S.Ct. at 710] "Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred." The First Amendment requires that we protect some falsehood in order to protect speech that matters.

### 2. *The Need for Judicial Scrutiny of the Standard of Care Applied by the Trier of Fact*

Because the purpose of the fault requirement is to minimize undesirable self-censorship, courts must closely scrutinize claims of negligence to prevent triers of fact from setting standards that could excessively chill press coverage. Negligence is an imprecise concept. An instruction to the jury on the meaning of negligence in a defamation case can probably achieve no greater precision than such an instruction in any other tort case. *See* SCRA 1986, Civ.UJI 13–1009 (uniform jury instruction for defamation, which adopts traditional language used to define negligence in ordinary tort context). Such imprecision ordinarily does not pose a significant problem. In the usual tort case no public policy is violated by giving the jury wide rein to determine what constitutes ordinary care for a reasonably prudent person. The requirement of negligence in defamation cases, however, has the purpose of advancing the first amendment interest in promoting the flow of information and ideas. We cannot expect juries to weigh first amendment principles adequately when determining the standard of care. Even specific jury instructions on the importance of the first amendment would surely be insufficient for the task. Indeed, perhaps the chief function of the first amendment is to protect against attitudes toward speech which are likely to be reflected by a jury. "[W]here first amendment rights are at stake, * * * jury flexibility is dangerous inasmuch as jurors are likely to represent majoritarian attitudes toward unpopular speakers and ideas." L. Tribe, *American Constitutional Law* § 12–13, at 882 (2d ed.1988). Therefore, in defamation litigation the judiciary must shoulder responsibility for the protection of first amendment values. This responsibility includes careful appellate review of findings of fault in defamation cases, even after non-jury trials. Appellate courts should conduct "an independent review of the record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 505, 104 S.Ct. 1949, 1962, 80 L.Ed.2d 502 (1984) (reversing trial court's finding of actual malice). *Accord Harte–Hanks Communications, Inc. v. Connaughton,* —— U.S. ——, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (affirming jury's verdict of actual malice). *See* Restatement, § 580B comment k (advocating appellate review of finding of negligence in defamation cases). *Cf. Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. at 518 n. 2, 104 S.Ct. at 1969 n. 2 (Rehnquist, J., dissenting) (factual review is more justified when finding was by jury).

Judicial oversight is not necessary solely to set minimum requirements for the standard of fault. Uncertainty as to the legal standard can itself cause undesirable self-censorship. *See Harte–Hanks Communi-*

*cations, Inc. v. Connaughton,* — U.S. at —, 109 S.Ct. at 2695, 105 L.Ed.2d at 588. By reviewing facts carefully and articulating why a defamation defendant has satisfied or failed to satisfy the requirements of the law, courts encourage adherence to sound reporting practices and minimize inappropriate self-censorship. *See* Robertson, *Defamation and the First Amendment: In Praise of Gertz v. Robert Welch, Inc.,* 54 Tex.L.Rev. 199, 256–57 (1976). In the words of Professor Tribe, "[T]he first amendment should be understood to require the states to develop bodies of law markedly clearer and more coherent than is customary in the common law of negligence." L. Tribe, *supra,* at 882–83 (footnote omitted).

Moreover, even when a jury ultimately vindicates the defendant in a defamation case, the burden of the litigation itself may have a substantial deleterious impact. Fear of the costs of trial, despite the probability of ultimate success, may deter publication of an important news item. *See* Anderson, *Libel and Press Self–Censorship,* 53 Tex.L.Rev. 422, 435–36 (1975). Summary judgment, therefore, serves an essential function in protecting first amendment interests. In defamation cases "courts cannot justifiably resolve all doubts against use of summary procedures because the important interests are not all on the side of preserving jury trial." *Id.* at 469.

### 3. *The Meaning of Fault in the Context of This Case*

Leading authorities have articulated the meaning of negligence in the defamation context as publishing an article "with negligent disregard for the truth," *Ricci v. Venture Magazine, Inc.,* 574 F.Supp. at 1571, or "with lack of reasonable grounds to believe in its truth." Restatement, *supra,* § 580B comment *1,* at 230–31. *Accord* W. Keeton, *Defamation and Freedom of the Press,* 54 Tex.L.Rev. 1221, 1227–28 (1976). The fault of defendants in this case could be viewed as arising in one of two ways: First, defendants may have been negligent in omitting from the article certain items that might have cast doubt on plaintiff's

identity as the arrestee. *See* Restatement, *supra,* § 611 comment b. Second, defendants may have been negligent simply for believing that plaintiff was the person who had been arrested.

With respect to the first theory of liability, Judge Keeton has concluded that the fault must be more than merely the omission of evidence from which a reasonable person might draw an inference contrary to that appearing in the article. He wrote:

It may be argued that Supreme Court decisions recognizing the constitutional requirement of fault with respect to accuracy of a derogatory statement of fact necessarily so modify earlier precedents regarding reports of public proceedings as to compel summary judgment for media defendants as to any challenge for incompleteness of a report in failing to disclose contentions or evidence contradictory to that correctly reported. I do not conclude that such an invariable rule is implicit in the constitutional requirement of fault. Nevertheless, it is clear that merely showing contradictory evidence upon which reasonable persons might come to different findings is insufficient to show that defendant displayed an unreasonable disregard for the accuracy or fairness of the report.

*Ricci v. Venture Magazine, Inc.,* 574 F.Supp. at 1571.

The second theory—that defendants were negligent in concluding that the arrested person was plaintiff—raises the question of how far a reporter must go in second-guessing an official arrest record. The above formulations of the meaning of negligence suggest that a publisher of a defamatory statement is not negligent if he has checked out the statement sufficiently to have a reasonable basis for believing it. Thus, liability would not result from failing to make an inquiry that might be reasonable if one wanted to "nail down" the statement, so long as the information already available makes belief in the statement reasonable. A situation similar to the one before us arose in *Bell v. Associated Press.* Police officers arrested an imposter claiming to be a football star; defendant report-

ed that the athlete had been arrested. The court denied liability, explaining:

> If the Associated Press were to be held liable, * * * it would have to be on the theory that, even with respect to what appeared to be a public figure involved in an official proceeding, it had a duty not to report on the proceeding as it was reflected in the official police and court records without first conducting a painstaking investigation into the accuracy of the official reports and the identity of the person charged. Such a rule would have the consequence of delaying significantly the publication of news concerning public figures who are charged with criminal offenses, or of halting the publication of such reports altogether. Because such consequences are inconsistent with the values embodied in the First Amendment, the law does not impose such burdens on the press. [Footnote omitted.]

*Id.* at 132. *See Wilson v. Capital City Press,* 315 So.2d 393 (La.Ct.App.3d Cir. 1975) (no negligence in relying on police press release of arrest); *Horvath v. Ashtabula Telegraph,* 8 Med.L.Rptr. 1657, 1982 WL 5841 (Ohio App.1982) (no negligence in identifying person arrested; no duty to interview the accused person); B. Sanford, *Libel and Privacy: The Prevention and Defense of Litigation* § 8.4.3.3 (1985) (discusses whether it is negligence to rely on an official source). *But see Melon v. Capital City Press,* 407 So.2d 85 (La.Ct.App.1st Cir.1981). Although the court in *Bell* found that the plaintiff was a public figure and therefore was considering only whether the defendant acted with actual malice, the concern expressed about the functioning of the press applies equally to our case. In Alamogordo there would be greater legitimate public interest in the arrest of plaintiff than in the out-of-state arrest of a nationally prominent football player.

### 4. *Application of the Legal Standard to the Facts in this Case*

The essential facts are not in dispute. To be sure, even when the parties agree on the facts, the jury in a typical negligence case still bears responsibility for determining whether the defendant's conduct was within the standard of care. Thus, if this were a typical negligence case, I would agree that summary judgment was improper on the issue of negligence. As explained above, however, the first amendment values at stake in a defamation action require judicial scrutiny beyond what would otherwise be appropriate. Courts must consider the implications for first amendment interests in permitting a finding of liability and restrict jury discretion accordingly. In light of that mandate, a review of the events of the day on which the article was published convinces me that reversal would impose too burdensome a standard of care on the everyday operation of our news media.

On the day of the article Clausen conformed to his usual morning schedule. That schedule would begin at the Daily News at about 7:30 a.m. Sometime before 8:30 a.m. he would go to the Department of Public Safety (DPS), then to the State Police office and on to City Hall to visit the municipal court, magistrate court, and other departments. He would also stop by the funeral home to see if there were any obituaries to publish. Usually he would return to his office between 10:00 and 10:30 a.m. and prepare his stories for an 11:00 a.m. deadline. The deadline occasionally could be delayed a bit, although layout of the paper needed to be completed by noon for the press run, so that distribution of the paper could begin about 12:30 p.m.

On January 23, 1987, Clausen received from the DPS Records Office a copy of the arrest record and the officer's handwritten report relating to James M. Furgason. He was not permitted to copy the documents, but he took notes. After reading the arrest record and the officer's report, Clausen, in accordance with his customary practice, went upstairs to talk to detectives to see if they could add anything more with respect to the case. He spoke with Detective Ray Bailey and Captain Richard Nix. Although there are discrepancies between the accounts of Clausen and the police officers concerning their discussions that morning, they agree that they spoke about the bizarre nature of the offense (undoubt-

edly referring not to the conduct itself but to its being committed by a prominent bar owner). After this discussion Clausen went back to the DPS Records Office to pick up the Crime Stopper report, which had not been typed when he first arrived. The report related to the burglary of plaintiff's home three weeks earlier. Clausen then returned to Bailey's office to ask if the gun involved in the arrest was the same one reported stolen by plaintiff. He inquired whether insurance fraud might be involved. Clausen testified that Bailey told him that he did not know if it was the same gun; Bailey testified that there was a discrepancy between the description of the gun in the arrest report and the description of the gun that had been provided by plaintiff after the burglary. Clausen noted that the Crime Stopper report mentioned that plaintiff reported a stolen wallet.

At about 9:30 a.m. Clausen left the DPS and spent five to ten minutes at the State Police office reviewing the log. From there he went to City Hall, where he asked the clerk for the list of the members of the Mayor's Committee on Alcoholism and Driving While Intoxicated. He had recognized the name "Furgason" on the arrest record as being the name of a member of the committee. He confirmed that "Jim Furgason" of "1407 Rockwood" belonged to the committee. He then continued with his usual routine, checking with the magistrate court, other offices at City Hall, the funeral home and then municipal court. While waiting for municipal court to finish, he, as was his custom, called the newspaper to let the city editor know what stories he had picked up. Clausen testified that he planned to attend the arraignment of Furgason at 10:00 a.m.; but the arraignment was moved to 11:00 a.m. Clausen returned to his office about 10:30 a.m. Between 10:30 and 11:00 a.m., or 11:20 a.m., he wrote the Furgason story and typed in the obituaries. Shortly before 11:00 a.m. he called the magistrate court to check on the arraignment of Furgason and was informed that the arraignment would be that afternoon.

Given the requirements of Clausen's routine and the newspaper deadline, Clausen took reasonable steps to check out his story. Besides discussing the matter with Detective Bailey, Clausen obtained from City Hall a list of the members of the mayor's committee and checked that the Furgason on the mayor's list had the same address as in the police report and the same work telephone number as that listed to Furgi's in both the city directory and the telephone directory. He noticed the discrepancy between the age and birth date on the arrest record and asked a DPS Records office employee about the matter. The employee responded that it was probably just an arithmetic error (which would be a reason not to be overly concerned about the specific height and weight reported on the arrest record). At the newspaper office Clausen called DPS to confirm his recollection of the essential facts stated on the arrest record. He also checked with another member of the newspaper staff to see if the description of Furgason's build seemed to fit. (It is not clear whether Clausen asked the staff member whether Furgason was "tall and thin" or specifically asked whether he appeared to be six feet six inches tall and 165 pounds.)

Although Clausen certainly had questions about the reported arrest, he pursued those questions with a variety of sources. The responses he received confirmed the identity of the person arrested. Nothing in the record suggests that anyone responsible for the article's publication maintained substantial doubts as to its truth before it was published. *See Moloney v. Tribune Publishing Co.*, 26 Wash.App. 357, 613 P.2d 1179 (1980).

To assist in evaluating the conduct of the newspaper, it is helpful to review the thoughts and acts of the police department, particularly those of Detective Bailey. Bailey testified that he thought the person arrested was plaintiff. When asked what he talked about with Clausen in the morning, he answered:

I believe I told him I thought there was something wrong, it didn't make sense. Like I say, it was just a casual conversation. And said it just didn't make sense, a man of his caliber being arrested for

chemical abuse. I made the statement, I believe that he only had 43¢ or something on him, which didn't make sense, either.

And he was just talking about the case in particular. And I told him I was still going to run the Crime of the Week, even though he was arrested for chemical abuse.

Bailey testified that the arrest bothered him the whole day. He had discussed it with the other detectives. Then, "just like a bolt of lightning, it hit us." Around 2:30 or 3:00 in the afternoon, while the detectives were having coffee, he realized that the person arrested might have obtained plaintiff's identification in the burglary of plaintiff's residence.

In my view, defendants did not act with negligent disregard for the truth in reporting that plaintiff had been arrested. Defendants' actions were reasonable under the circumstances. Arrests in general are matters of public concern. *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. at 491–92, 95 S.Ct. at 1044–45. The apparent arrest in this case would be of particular importance because of the status of plaintiff. Therefore, publishing the story in the earliest possible edition was appropriate. Yet time constraints presented Clausen with very little opportunity for a full investigation. *See Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 68, 424 N.Y.S.2d 165, 168, 399 N.E.2d 1185, 1187 (Ct.App.1979) (court takes into account that article was "composed * * * under the exigencies of a publication deadline."); B. Sanford, *supra*, at § 8.4.7 (discusses negligence in the context of "hot" news). To be sure, a newspaper story that one has been arrested for a crime can cause serious damage to one's reputation; but Clausen had reasonable grounds to believe that the story was true. The name and address checked out. No apparent discrepancy was of such weight as to cast substantial doubt on the accuracy of the official report. Moreover, unlike in many defamation cases, a proper retraction could remedy virtually all the damage to plaintiff's reputation. Although an arrest followed by dismissal of the charges can leave a permanent stain, misidentification of the person arrested is remediable. A prompt and prominent correction to the effect that one was never in fact arrested should erase the blot. *See* Restatement, *supra*, § 580B comment h (factors to be considered in assessing negligence are the time element, the interest promoted by the publication, and the potential damage to the plaintiff).

In weighing the public's need for prompt, informative reporting concerning the conduct of its government, particularly the operation of the criminal justice system, against the potential injury to individual members of society resulting from the media's failure to delay publication while all leads are followed, I believe that the balance must be struck in favor of the public interest, as expressed in the first and fourteenth amendments to the Constitution. When, as here, the press has an objectively reasonable basis to credit the accuracy of an official report of breaking news, publication need not be delayed to double check the accuracy of the official report. To impose liability on defendants on the record in this case would create unrealistic burdens on our news media, particularly the small-town daily newspaper. I respectfully dissent.